CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2012 JUL 16  PM 4: 13

DEPUTY CLERK____ NT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

-------------------------------------------------------x

NEXSTAR BROADCASTING, INC.,          :
                                     :
            Plaintiff,               :
                                     :          ___ Civ. ____
     -against-                       :
                                     :     **3-12CV-2380P**
TIME WARNER CABLE INC.,              :
                                     :
            Defendant.               :

-------------------------------------------------------x

## VERIFIED COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF

Plaintiff Nexstar Broadcasting, Inc. ("Nexstar"), for its Complaint against

Defendant Time Warner Cable Inc. ("Time Warner" or "TWC"), alleges as follows:

### NATURE OF THE CASE

1.      Nexstar brings this action to stop Time Warner from misappropriating the

signals of several television broadcast stations owned by Nexstar.  Without authorization

from Nexstar, Time Warner is transmitting these broadcast signals -- which contain local

news programming produced by Nexstar, national network programming licensed from

the NBC and CBS national networks and syndicated programming licensed from third

parties -- through Time Warner cable systems in distant markets.  Time Warner's conduct

violates the explicit terms of a Retransmission Consent Agreement ("RCA") between the

parties executed in June 2009, attached hereto as Exhibit 1, and infringes Nexstar's

copyright interests.  Time Warner's conduct should be immediately enjoined.

2.      Last week, Nexstar was alerted by third-parties that Time Warner had

begun retransmitting signals from Nexstar stations located in Terre Haute, Indiana (*i.e.*,

the NBC affiliate, WTWO-TV);Wilkes-Barre, Pennsylvania (*i.e.*, the NBC affiliate,

251510.2

WBRE-TV); and Rochester, New York (*i.e.*, the CBS affiliate, WROC-TV) through

Time Warner cable systems located in the following markets:  Cincinnati, Ohio;

Louisville, Kentucky; Orlando, Florida; Winston-Salem, North Carolina; and Burlington,

Vermont-Plattsburgh, New York.  (These markets are referred to as the "Distant

Markets.")  Time Warner continues today to retransmit these signals into these Distant

Markets -- a practice known as "distant retransmission."

3.     Time Warner did *not* notify Nexstar, at any point in time, that it would be

distantly retransmitting the broadcast signals of these stations into the Distant Markets.

Nonetheless, after discovering Time Warner's illegal behavior, Nexstar, by letter dated

July 11, 2012, demanded that Time Warner immediately cease its illegal actions.  Time

Warner refused to do so, requiring Nexstar to seek judicial intervention.[1]

4.     The unambiguous and explicit terms of the RCA -- which grants Time

Warner *limited* authorization to retransmit the signals of Nexstar television stations,

including WTWO, WBRE and WROC, within each station's local market --

demonstrates the illegality of Time Warner's conduct.  The RCA shows that Nexstar

never authorized Time Warner to distantly retransmit any of its stations' signals -- let

alone the signals of WTWO, WBRE and WROC into markets hundreds of miles distant.

For example, Section 2(a) of the RCA states that *only* Time Warner cable systems "that

are located in the Television Market . . . of a [Nexstar] Station" shall have the right to

retransmit signals of the Nexstar stations.  Moreover, the payment provisions of the RCA

confirm that Nexstar never authorized distant retransmission of these signals.  Exhibit B

to the RCA shows that the compensation afforded to Nexstar in exchange for its

---

[1] Nexstar has also sought Federal Communication Commission ("FCC") intervention with respect to Time Warner's violation of certain FCC notice rules.  However, the FCC has no jurisdiction over copyright matters and defers all contract disputes to court adjudication.

251510.2

agreement permitting Time Warner's retransmission is based only on the number of Time Warner subscribers located in each relevant station's local market. The RCA does not provide for compensation to Nexstar based on the number of Time Warner subscribers in the Distant Markets. Accordingly, Time Warner is not even compensating Nexstar for these unauthorized distant retransmissions.

5.      Nexstar has a copyright interest in local news programming that it produces and broadcasts via the WTWO, WBRE and WROC signals. By distributing this programming into the Distant Markets without authorization, Time Warner has infringed Nexstar's copyright interests.

6.      Time Warner's unauthorized distant retransmission of Nexstar signals is irreparably harming Nexstar's goodwill with its national networks and advertisers. As Time Warner is well aware, under its network affiliation agreements, Nexstar cannot authorize the retransmission of network programming outside of the particular local markets served by its stations. Moreover, Time Warner's conduct is subjecting Nexstar to claims of trademark infringement by entities located in the Distant Markets, even though Nexstar never intended to send its programs and advertisements to these Distant Markets.

7.      Time Warner's conduct is also causing viewer confusion, as viewers are receiving programming and advertisements targeting markets that are far from their homes. For example, Time Warner subscribers in Louisville are now viewing WROC's Rochester-targeted signals, containing advertisements by Rochester-based businesses and Rochester-specific news and weather programming. Confused viewers have contacted

251510.2

Nexstar stations wondering why their local stations have been replaced with those from distant cities.

8.      Further, due to Time Warner's unauthorized distant retransmission of WBRE into the Winston-Salem market, the exact same syndicated programming is being transmitted into Winston-Salem via WBRE and a second Winston-Salem station at the exact same time -- meaning a viewer can easily confuse which station he or she is watching. A station in the Orlando market has also notified Nexstar of this problem and Time Warner is now blacking out two WTWO syndicated programs in the Cincinnati market for this same reason. This violates rules of the FCC and, among other reasons, is likely one reason why Time Warner has not distantly retransmitted Nexstar programming in Orlando, Cincinnati, Winston-Salem, Plattsburgh-Burlington or Louisville for the three years that the RCA has been in effect (or for that matter, at any time prior to last week).

9.      Nexstar seeks immediate and permanent injunctive relief to remedy the irreparable harm that it is suffering. It also seeks monetary damages for Time Warner's illegal conduct.

## JURISDICTION AND VENUE

10.     This action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq., and state law. Pursuant to the RCA, Texas state law applies. RCA § 17 ("This Agreement shall be governed by and construed under and in accordance with the laws of the State of Texas subject to applicable provisions of the [Communications] Act and the FCC Rules.").

4

251510.2

11.     This Court has exclusive subject matter jurisdiction over Nexstar's copyright claims pursuant to 28 U.S.C. § 1338 and § 1331.  This Court has pendent jurisdiction over Nexstar's state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 1400(a).  Nexstar is headquartered in this District and is suffering injury here. Defendant Time Warner transacts business in and is found in this District.  According to its website, Time Warner's Dallas Division employs 1,600 people and serves 600,000 subscribers in the region.[2]

## PARTIES

### A.     Plaintiff Nexstar and Local Stations Covered by the RCA

13.     Nexstar is a Delaware corporation with its principal place of business in Irving, Texas.  Nexstar owns, operates, programs or provides sales and other services to television stations located in various U.S. markets.

14.     Nexstar is actively engaged in the production and distribution of television programs and other copyrighted works.  Pursuant to affiliation agreements with the Big Four Networks (ABC, CBS, FOX and NBC), Nexstar stations are licensed to grant retransmission consent for national network programming, but, with narrow exceptions not applicable here, only within their local markets.[3]  All Nexstar stations are limited under these network affiliation agreements from carrying network programming outside

---

[2]  *See http://www.timewarnercable.com/Corporate/about/careers/locations/dallas_tx.html.*

[3]  The exceptions allow Nexstar to grant retransmission consent for communities outside of the station's designated market area ("DMA") if the station is "significantly viewed" in that area or was carried on the cable system as of April 1, 1993.  Under FCC rules, certain stations are considered "significantly viewed" based on over-the-air viewing, even if they are licensed outside a particular DMA.  These stations are treated as local stations for broadcast signal carriage purposes.  The FCC grants significantly viewed status to commercial stations based on petitions from broadcasters or cable/satellite operators that show that a station satisfies viewing criteria on a community-wide or county-wide basis.  47 C.F.R. § 76.54(b), (d); 47 C.F.R. § 76.5(i)(1)-(2).

251510.2

of their local markets. The stations are similarly limited in the distribution of syndicated programming to only in their market.

15.     WROC is a CBS-affiliated television station located in Rochester, New York owned and operated by Nexstar. WROC is actively engaged in the production and distribution of television programs and other copyrighted works, including local news programming, CBS network programming and syndicated programming, throughout the Rochester DMA.[4]

16.     WBRE is an NBC-affiliated television station located in Wilkes-Barre, Pennsylvania that is owned and operated by Nexstar. WBRE is actively engaged in the production and distribution of television programs and other copyrighted works, including local news programming, NBC network programming and syndicated programming, throughout the Wilkes-Barre-Scranton DMA.

17.     WTWO is an NBC-affiliated television station located in Terre Haute, Indiana that is owned and operated by Nexstar. WTWO is actively engaged in the production and distribution of television programs and other copyrighted works, including local news programming, NBC network programming and syndicated programming, throughout the Terre Haute DMA.

### B.     Defendant Time Warner

18.     Defendant Time Warner is a Delaware corporation with headquarters in New York, New York. Time Warner engages in business in the State of Texas, does not maintain a registered agent in the State of Texas, and is a Defendant in this proceeding arising out of business done in the State of Texas. Time Warner may be served with

---

[4] A DMA is a Nielsen-defined television market comprised of a unique group of counties. The United States is divided into 210 DMA markets.

251510.2

process pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(a)-(b) by service of two copies of process upon the Texas Secretary of State, in accordance with Tex. Civ. Prac. & Rem. Code § 17.026, provided that the citation and petition are forwarded by certified mail return receipt requested, to Time Warner Cable Inc., One Time Warner Center, New York, NY 10019-8016 (home office/headquarters). According to its website, Time Warner has more than 12 million residential video subscribers in 29 states.[5] Time Warner owns, operates or provides management services to cable systems in the Distant Markets as well as the Rochester, Terre Haute, and Wilkes-Barre/Scranton markets.

## FACTUAL ALLEGATIONS

**A.      Industry Background:  Cable Carriage of Local Broadcast Stations**

19.     In the 1992 Cable Act, Congress established a regime for carriage of broadcast television stations on cable systems.[6]

20.     Specifically, Congress gave broadcasters control over the use of their stations' signals and permitted them to seek compensation from cable operators for carriage of their signals. This system is referred to as retransmission consent.

21.     The Communications Act and FCC rules govern the process whereby cable operators carry local broadcast stations in local television markets. Within their local DMAs, commercial television stations may elect cable carriage under either "must-carry" or retransmission consent requirements.[7] Cable systems are only permitted to carry broadcast stations outside of a station's DMA with the specific authorization of the

---

[5] See *http://www.timewarnercable.com/Corporate/about/highlights*.

[6] Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992); H. Rep. No. 628, 102d Cong., 2d Sess. (1992). *See also* 47 U.S.C. § 534 (carriage of commercial television stations); 47 U.S.C. § 325 (retransmission consent).

[7] *See* 47 C.F.R. § 76.64.

251510.2

television station's owner, which can only be granted only with the consent of the networks.

22.     Generally, under the must-carry regime, a local commercial broadcast television station is entitled to carriage if, among other things, it serves the same market as the cable system.[8]  If a local broadcast station elects retransmission consent -- as Nexstar has done here -- the cable operator and broadcaster negotiate the terms of a retransmission consent agreement, which may include monetary or other compensation for carriage of the broadcast signal.

23.     Broadcast stations negotiate to be the exclusive distributor of specific programming in a local market.  Thus, a broadcaster can carry network and syndicated programming on its television station(s) only with the permission of the networks or syndicators that own or hold the rights to that programming.

24.     Various FCC rules permit television stations to enforce their rights to be the exclusive distributor of network and syndicated programming in their local markets. For example, where a cable operator carries more than one station with the rights to a program, the FCC's exclusivity and blackout rules, along with the provisions in network and syndication programming contracts, protect the rights of stations to be the exclusive distributor.  That is, the FCC's network non-duplication rules allow a broadcaster to protect its right to be the exclusive distributor of network programming within a specified zone, and require programming subject to the rules to be blacked out when carried on another station's signal imported by a cable or satellite operator into the local station's

---

[8] *See* 47 C.F.R. § 76.55(c)(3); 47 C.F.R. § 76.56(b)(5).

251510.2

zone of protection.[9]  Similarly, the syndicated exclusivity rules protect the exclusive

distribution rights of a commercial broadcast television station for syndicated

programming within the zone of protection surrounding a television station's city of

license.[10]

**B.**     **The RCA**

25.     In June 2009, Nexstar, Mission Broadcasting, Inc. ("Mission"), Four

Points Media Group Holding LLC ("Four Points"), and Time Warner entered into the

RCA.  The RCA's term ends June 30, 2014.  RCA § 4.  The agreement covers some 58

stations owned by Nexstar, Mission and Four Points.

26.     Section 1 of the RCA sets forth the consent provided to Time Warner:

> **1.**     **Retransmission Consent**.  Owner hereby
> gives Operator its consent, pursuant to Section 325(b) of
> the Act and the FCC Rules, to the nonexclusive
> retransmission of the entire broadcast signal of each Station
> (the "Signal") over each System *pursuant to the terms of
> this Agreement.*  Operator agrees to retransmit the Stations'
> Signals *subject to the requirements of Section 2 below.* . . .
> (Emphasis added.)

27.     Thereafter, Section 2 of the RCA specifies the geographic areas in which

Time Warner can retransmit programming.  Section 2(a) of the RCA states that "each

Upgraded System *that is located in the Television Market (as defined by the FCC Rules)*

*of a Station* shall retransmit, at its own expense, such Station's" signal as set forth in

RCA Exhibit A, listing the stations covered and each station's market.[11]

28.     Other sections of the RCA also demonstrate that the license granted to

Time Warner thereunder is subject to strict geographic limitations.  *See* RCA § 2(b) ("In

---

[9] *See* 47 C.F.R. §§ 76.92, 76.93 and 76.122.

[10] *See* 47 C.F.R. §§ 76.101 and 76.120.

[11] "Television Market" as used in the RCA is synonymous with DMA.

251510.2

each [Time Warner] System . . . *located within a Station's Television Market*, [Time Warner] will downconvert to an analog format the Primary Program Transport Stream of the Signal of each Station . . . ."); § 2(c) ("each applicable Upgraded [Time Warner] System *within a Station's Television Market* shall retransmit in HDTV format the applicable Station's Primary Transport Stream") (emphasis added).

29.     No Time Warner systems other than those "located in a Television Market" of a covered station are given any authorization under the RCA to retransmit the signals of covered stations.  *See* RCA § 7 ("Except as specifically permitted herein . . . no [Time Warner] System shall . . . retransmit . . . any portion of the Stations' Signals without Owner's prior written consent . . . .").

30.     Moreover, Exhibit A of the RCA confirms the parties' agreement over the specific DMA (or Television Market) in which a particular covered station's signals would be transmitted.  It shows that the RCA only provides for Time Warner to retransmit: (1) WBRE's signal in the Wilkes-Barre DMA; (2) WTWO's signal in the Terre Haute DMA; and (3) WROC's signal in the Rochester DMA.  Exhibit A of the RCA identifies the specific "Markets" in which specific covered stations will have their signals retransmitted by Time Warner systems.  None of the Distant Markets are listed in Exhibit A to the RCA.

31.     RCA Exhibit B sets forth the compensation for carriage based on the number of "Station Subscriber[s]," defined as "each System subscriber *located in the Television Market of a Station* that is the primary affiliate of the ABC, CBS, Fox or NBC broadcast network . . . ."  RCA Exhibit B § 1.a.

251510.2

C.    **Time Warner's Unauthorized Retransmission of
Nexstar Broadcast Signals**

1.    **Time Warner's Distant Retransmission in December 2010**

32.    Commencing on December 16, 2010 and ending on January 9, 2011, Time Warner distantly retransmitted signals of two stations covered by the RCA without authorization from station owners Nexstar or Mission. In that instance, Time Warner provided Nexstar with only a few hours notice prior to beginning this distant retransmission.

33.    During this time, Time Warner retransmitted WBRE's signal outside of the Wilkes-Barre DMA throughout the Utica, New York DMA, and retransmitted WUTR -- an affiliate of the ABC network owned by Mission -- located in the Utica DMA throughout the Burlington, Vermont/Plattsburgh, New York DMA. Time Warner did not seek consent from and did not provide compensation to Nexstar or Mission for these distant retransmissions.

34.    Nexstar demanded that Time Warner stop these retransmissions as soon as it learned of the conduct. Exhibit 2 is Nexstar's cease and desist letter dated December 16, 2010; Exhibit 3 is Time Warner's response. Time Warner refused to stop retransmission. Nexstar wrote to Time Warner again setting forth Time Warner's breach of the RCA and federal law in a letter dated December 21, 2010 (attached as Exhibit 4), and Time Warner responded on December 22, 2010 (attached as Exhibit 5).

35.    Also, on December 28, 2010, Nexstar and Mission submitted to the FCC an Emergency Petition for Injunction Prohibiting Carriage based on Time Warner's failure to provide Nexstar, Mission, and Time Warner's subscribers and franchising authorities with the Commission-required 30-days' advance notice that Time Warner

251510.2

intended to substitute Nexstar's station WBRE for the NBC affiliate in the Utica DMA and Mission's station WUTR for the ABC affiliate in the Burlington-Plattsburgh DMA.[12] The 2010 Petition remains pending with the FCC.

36.     By letter dated December 31, 2010, NBC also demanded that Time Warner cease and desist because under its affiliation agreement, "Nexstar cannot grant retransmission consent outside the appropriate Television Market." Exhibit 6; *see also* Exhibit 7 (Cease and Desist Letter from ABC dated December 30, 2010.)

37.     At the time, Time Warner distantly retransmitted the signals of WBRE and WUTR because of a contractual impasse that Time Warner reached with parties unrelated to Nexstar.  Specifically, at that time, the owners of the NBC network affiliate in Utica (*i.e.,* Smith Media License Holdings, LLC) and the ABC network affiliate in Burlington-Plattsburgh (*i.e.,* Lambert Broadcasting of Burlington, LLC), in the course of contractual negotiations, exercised their rights to terminate the distribution of their station signals on Time Warner systems.  After reaching retransmission consent agreements with Smith and Lambert -- on January 9, 2011, Time Warner ceased retransmitting the signals of WBRE and WUTR outside of their DMAs, and has not subsequently carried WBRE in Utica or WUTR in Burlington-Plattsburgh.

38.     After the unauthorized retransmission ceased in January 2011, under a reservation of rights, Nexstar demanded that Time Warner affirm that it would not again retransmit the signal of any covered station outside of its local DMA. Exhibit 8.  Time Warner refused to so affirm, *see* Exhibit 9, but did not state then -- or at any time

---

[12] *See Time Warner Cable, Emergency Petition for Injunction Prohibition of Carriage in Violation of the Commission's Rules,* CSR-8382-C, submitted by Nexstar and Mission Broadcasting, Inc. on December 28, 2010. As with the Petition submitted to the FCC on July 14, 2012, the 2010 Petition sought FCC enforcement of its rules which require Time Warner to provide advance notice to broadcast stations when a cable system makes changes to where and how the station is carried by the system.

251510.2

thereafter -- that in the future it intended to again distantly retransmit the signals of any stations covered by the RCA, including the signals of WBRE, WTWO or WROC.

39.     Time Warner's actual course of conduct while the RCA has been in effect shows that its distant retransmissions violate the unambiguous terms of the RCA. For the overwhelming amount of time that the RCA has been effective (and at all times prior to its effectiveness), Time Warner has refrained from distantly retransmitting the signals of covered stations. And, following Nexstar's complaints, FCC proceeding and threatened legal action, Time Warner ceased its distant retransmission activities and did not notify Nexstar that they would occur again.

### 2.     Time Warner's Current Distant Retransmissions

40.     Now, Time Warner has once again acted lawlessly -- this time distantly retransmitting Nexstar signals in more and different distant markets located even farther from each local station. And, in contrast to 2010, Time Warner engaged in this conduct without providing *any* notice to Nexstar.

41.     Time Warner is currently distantly retransmitting Nexstar signals because it no longer has the right to retransmit television stations owned by Hearst Television, Inc. ("Hearst"). Hearst had a retransmission consent agreement with Time Warner for the carriage of television stations WPTZ (in Plattsburgh), WNNE (in Hartford, Vermont), WXII-TV (in Winston-Salem), WLWT (in Cincinnati), and WLKY (in Louisville) on its cable systems in the applicable DMAs. That agreement expired at 11:59 p.m. on July 9.

251510.2

Hearst's agreement with Bright House Networks for carriage of WESH in Orlando also expired at 11:59 p.m. on July 9.[13]

42.     On the morning of July 10, 2012, (1) WBRE began receiving emails and phone calls from viewers in Orlando, Plattsburgh and Winston-Salem that its signals were being transmitted there, (2) WROC began receiving calls from the Louisville area that its signals were being transmitted there, and (3) WTWO began receiving calls and postings to its Facebook page from viewers in Cincinnati that its signals were being transmitted there.  In addition, on July 10, 2012, Nexstar received notice from its NBC contact, who asked Nexstar if it was aware of Time Warner's use of its signals in distant markets.  After further research, Nexstar determined that Time Warner was redistributing the WBRE, WTWO and WROC signals on distant systems located hundreds of miles away as "replacement stations" for the Hearst television stations, and demanded that Time Warner cease such unauthorized retransmission.

43.     This conduct violates the FCC's rules concerning network non-duplication.  Under these rules, in geographic zones where a broadcaster holds exclusivity rights to broadcast a network's programming, a cable operator may not air that network's programming by any broadcaster other than the one with the exclusive rights.  47 C.F.R. § 76.92.  By retransmitting Nexstar's signal into the Distant Markets -- where Hearst possesses exclusive network rights -- Time Warner is in violation of FCC regulations concerning network non-duplication.

44.     Moreover, NBC has objected to the distribution of its programming via Time Warner's distant retransmission of Nexstar stations.  By letter dated July 12, 2012

---

[13] Time Warner has a management services agreement with Bright House Networks, which includes retransmission consent matters.

251510.2

to Time Warner, NBC demanded that Time Warner cease its distant retransmission actions  Exhibit 10.

45.     Time Warner's distant retransmission also violates the FCC's syndicated programming exclusivity regulations.  These rules provide that, in geographic zones where a broadcaster holds exclusivity rights to broadcast a syndicated program (i.e., a program whose broadcast rights are purchased without going through a network), a cable operator may not air that syndicated program by any broadcaster other than the one with the exclusive rights.  47 C.F.R. § 76.101.  By its transmission of Nexstar's signal to the Distant Markets, Time Warner is in violation of these rules.  *See, e.g.*, Exhibit 11 at 2 (Letter dated July 12, 2012 on behalf of WFTV in Orlando notifying Nexstar of Time Warner's retransmission of "The Dr. Oz Show" and "other syndicating programming in the Orlando market where WFTV has exclusive rights"); Exhibit 12, Mike Kernals, *Cable Spat Continues, Resolution Uncertain*, News & Record, Greensboro, NC, July 14, 2012, ("And there's the problem. From 7 to 8 p.m., 'Wheel of Fortune' and 'Jeopardy' are on WBRE.  The thing is, those shows already are on local CBS affiliate WFMY -- during the same hour.").

### D.     Time Warner's Distant Retransmissions Harm Nexstar

46.     Time Warner's copyright infringement and contractual breach has caused substantial, irreparable harm to Nexstar and threatens to cause additional harm.  The harm -- the misappropriation of Nexstar's valuable broadcast signals and the intellectual property they transmit -- is serious but difficult to quantify.

251510.2

### 1.    Harm to Nexstar's Relationships with Networks

47.    Time Warner's unauthorized, distant retransmission of Nexstar's signals contravenes the terms of Nexstar's affiliation agreements with NBC and CBS and is harming Nexstar's relationships with those crucial suppliers. These agreements grant Nexstar exclusive licenses to broadcast network programming in geographic areas of limited scope. For example, Nexstar's agreement with NBC provides that Nexstar "shall not grant consent to the retransmission of its broadcast signal by any cable television system . . . if such cable system . . . is located outside the [Designated Market Area] to which Station is assigned . . . ." Exhibit 13 at 16(b)(i). Likewise, Nexstar's affiliation agreement with CBS provides that "[Nexstar] may grant consent to the retransmission of [WROC's] signal by a cable system . . . provided that . . . (i) the cable system . . . serves television homes within [WROC's] television market." Exhibit 14 at 4(b).

48.    Nexstar did not even to attempt to grant Time Warner the ability to distantly retransmit CBS and NBC programming. Regardless, the distant retransmission of Nexstar's signals -- which, by definition, distantly retransmits NBC and CBS programming -- is souring the relationship between Nexstar and the networks, and is causing tension between the networks and their broadcast affiliates in the Distant Markets.

49.    The damage to Nexstar's relationship with the networks is hindering its current negotiations with NBC and CBS for new network affiliation agreements. As a result, Time Warner's conduct is threatening Nexstar's ability to reach these new agreements and crippling its business relationships with two major networks. Any failure to enter a new affiliation agreement would irreparably harm Nexstar by stripping it of the ability to provide essential programming that viewers demand.

16

251510.2

### 2.   Harm to Nexstar's Goodwill with Advertisers

50.   Time Warner's conduct has also harmed Nexstar's relationship with advertisers.  It has put Nexstar is in a uniquely compromised and absurd position with its advertisers:  Nexstar cannot say with certainty where a particular advertisement will be shown.  Losing the ability to measure the number of viewers or their location threatens to undermine Nexstar's business relationships with advertisers.

51.   Moreover, certain advertisers -- like local franchisees of a national corporation (*e.g.*, car dealerships, restaurants) -- may be contractually restricted from airing their television commercials outside of their local markets.  Nexstar has received one such complaint from an advertiser in Rochester whose Rochester-local franchisees have different (and lower) priced points from the Louisville-local franchisees.  Time Warner's unauthorized actions may cause even more harm for certain local-only advertisers (e.g., attorneys).  A Wilkes-Barre, Pennsylvania law firm has threatened to withdraw all of its advertising due its very real concern about being subjected to liability in Florida for advertising legal services where they are not admitted to practice law in violation of local ethical standards.  Nexstar's goodwill is being harmed with respect to these advertisers in particular.

52.   Nexstar's advertisers are also being harmed by the confusion resulting from their commercials being aired in the Distant Markets.  Time Warner itself acknowledges the vexatious consequences of its unauthorized out-of-market retransmissions on its Website's FAQ addressing the Hearst blackouts:

> Q: I saw an ad on this station that you're bringing in from out of town for a discount on something, but the local stores aren't honoring the discount.  What can you do about that?
>
> A:  Unfortunately, there's nothing we can do about the advertising on the stations from out of town–we're trying to make sure that our customers continue to get the

251510.2

national network programming they watch, not necessarily the ads.  Typically in those situations, however, the ads themselves will say that any specials are available in participating locations only; we don't have any control over whether the local stores are participating in those promotions.

53.     This inevitable viewer confusion has also caused disruptions at Nexstar stations.  Through no fault of their own, station operations employees have been forced to address the concerns of out-of-market viewers contacting stations by phone, email, and on social media.

### 3.     Time Warner Has Wrongfully Exposed Nexstar to Legal Claims from Local Broadcasters in Distant Markets

54.     Time Warner's unauthorized distant retransmissions are wrongfully exposing Nexstar to legal claims brought by local broadcasters.[14]  For instance, on July 12, 2012, Nexstar received a letter from counsel representing WFTV, a local broadcaster in Orlando, a DMA where Time Warner is retransmitting WBRE without Nexstar's consent.  Exhibit 11.

55.     According to the letter, both broadcasters televise programs called EYEWITNESS NEWS, EYEWITNESS DAYBREAK, and EYEWITNESS NEWS AT 5.  WFTV claims that it has used these service marks since 1972 in the local Orlando market, and Nexstar is therefore allegedly infringing on these trademarks and causing viewer confusion.

56.     Moreover, WFTV also claims that Nexstar is tortiously interfering with WFTV's exclusive rights to air syndicated programming in the Orlando area because WBRE airs some of the same syndicated programming as WFTV.  Exhibit 11.

---

[14] Under RCA § 9(c), Time Warner must indemnify Nexstar for any losses from such third party claims, including Nexstar's attorney's fees.

251510.2

57.     Nexstar, of course, never intended for its Wilkes-Barre broadcasts to air in Orlando, or anywhere other than the Wilkes-Barre DMA.  Nexstar faces claims of trademark infringement and tortious interference solely because of Time Warner's unauthorized retransmission of WBRE's signal.

### CLAIMS FOR RELIEF

### COUNT I

### (Copyright Infringement)

58.     Nexstar realleges every allegation of this Complaint as if fully set forth herein.

59.     Nexstar (and/or its parents, subsidiaries, or affiliates) are the legal or beneficial owners of the copyrights in numerous programs that have been, or will be, exhibited over local broadcast television stations as well as other media outlets such as the websites associated with each station.  A non-exhaustive list of such television programs, indentifying representative examples of programs in which Nexstar (and/or its parents, subsidiaries, or affiliates) own the pertinent copyright interests, is set forth in Exhibit 15 (TV Programs).

60.     Each such TV Program is an original audiovisual work that has been or will be fixed in a tangible medium of expression and constitutes copyrightable subject matter within the meaning of Section 102 of the Copyright Act, 17 U.S.C. § 102.

61.     Each such TV Program has been or will be registered with the United States Copyright Office, or is or will be the subject of an application for registration filed with the Copyright Office.  Documentation demonstrating compliance with Section 411 of the Copyright Act, 17 U.S.C. § 411, is attached hereto as Exhibit 16.

62.    Each TV Program has been created or licensed for exhibition by Nexstar (and/or its parents, subsidiaries, or affiliates).  Time Warner is retransmitting each TV Program without authorization in the Distant Markets and, potentially, other locations.

63.    Nexstar performs or authorizes the performance of the TV Programs and other copyrighted works in the United States and elsewhere via broadcast, cable, and satellite television.  Nexstar also performs or authorizes the performance of its audiovisual works via the Internet and otherwise.

64.    Nexstar has invested and continues to invest substantial sums of money, as well as time, effort, and creative talent, to create, manufacture, advertise, promote, sell, distribute, perform, and authorize others to distribute and perform Nexstar's copyrighted audiovisual works.  Nexstar additionally has invested substantially in the broadcasting infrastructure through which Nexstar delivers its copyrighted works to licensees and the public.  Nexstar is compensated for its creative efforts and monetary investments largely from advertising, fees generated from carriage on cable and satellite systems, and from the licensing, sale, distribution and performance of its audiovisual works, including authorized online distribution and performance.

65.    Under Section 106 of the Copyright Act, 17 U.S.C. § 106, Nexstar has the exclusive rights, among other things, to "reproduce the copyrighted work," to "perform the copyrighted work publicly," and to authorize any such activities.  17 U.S.C. §§ 106(1)(4).

66.    Neither Nexstar nor any other person authorized by Nexstar has granted any license, permission, or authorization to defendant to exercise any of the rights set forth in the preceding paragraphs or to authorize others to exercise such rights, respecting

251510.2

the TV Programs or any other works in which Nexstar (and/or its parents, subsidiaries, or affiliates) own copyrights, other than the right to retransmit specific station signals according to the RCA.

67.     Nexstar has not authorized Time Warner to retransmit the signals of its stations into any distant market. As Time Warner's retransmission is outside the scope of Nexstar's consent in the RCA, it is "not permissible under the rules, regulations, or authorizations of the Federal Communications Commission" and constitutes copyright infringement under Section 111 of the Copyright Act, 17 U.S.C. § 111(c)(2)(a).

68.     Under Section 111(c)(2) of the Copyright Act, Time Warner's secondary transmission of Nexstar's broadcasts has been both "willful" and "repeated" and is "fully subject to the remedies provided by sections 502 through 506" of that Act.

69.     As a result of these violations of the Copyright Act, Nexstar has been injured in its business and property.

70.     As a result of these violations the Copyright Act, Nexstar faces irreparable injury. Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted. Nexstar has no adequate remedy at law.

## COUNT II

### (Breach of Contract)

71.     Nexstar incorporates fully the above paragraphs by reference thereto.

72.     The RCA is a valid and enforceable contract between the parties.

73.     Nexstar has fulfilled its obligations under the RCA, including by making its stations' signals available for retransmission by Time Warner as provided by the RCA.

251510.2

74.     Despite Nexstar's performances, Time Warner has breached, and continues to breach, the RCA by retransmitting Nexstar's local stations in the Distant Markets.

75.     Nexstar has sustained damages as a result of Time Warner's breaches as described above.  Moreover, Time Warner's violations of the RCA create an imminent risk of harm that cannot be compensated by money damages alone, and for which Nexstar seeks injunctive relief.

## APPLICATION FOR INJUNCTIVE RELIEF

76.     Nexstar incorporates fully the above paragraphs by reference thereto.

77.     Pursuant to Fed R. Civ. P. 65(a)-(b)  and 17 U.S.C. § 502, Nexstar requests this Court issue a temporary restraining order, and upon hearing, a preliminary injunction, and upon trial on the merits, a permanent injunction, enjoining, restraining, and prohibiting Time Warner from distant retransmission of any Nexstar local station signal without Nexstar's express consent.

78.     Because Nexstar has demonstrated a substantial likelihood of success on the merits; that it will suffer immediate and irreparable harm in the absence of such relief; that a greater injury will result from denying the temporary restraining order than from granting it; and that the requested relief will not disserve the public interest, Nexstar respectfully requests this Court to:  (1) grant a temporary restraining order; (2) set a hearing on Nexstar's application for preliminary injunction at the Court's earliest convenience and upon or after such hearing; (3) issue a preliminary injunction against Nexstar, as well as its officers, agents, servants, employees, attorneys, and those persons

251510.2

and entities in active concert or participation with them, from distant retransmission of any Nexstar local broadcast signal without Nexstar's express consent.

79.     Nexstar further requests that at the conclusion of trial, the Court issue a permanent injunction permanently extending the relief granted by the preliminary injunction.

80.     Nexstar is prepared to give security in the form of a bond or otherwise as the Court deems appropriate, pursuant to Fed. R. Civ. P. 65(c).

## DEMAND FOR JURY TRIAL

81.     Nexstar hereby demands a trial by jury as to all issues so triable.

## RELIEF SOUGHT

WHEREFORE, plaintiff Nexstar respectfully requests the following relief:

A.     That the Court declare, adjudge and decree that defendant Time Warner has infringed Nexstar's copyrights in violation of 17 U.S.C. § 101 et seq. by retransmitting Nexstar's stations' signals in the Distant Markets without Nexstar's express consent as alleged herein;

B.     That the Court declare, adjudge and decree that defendant Time Warner has breached the RCA by retransmitting Nexstar's stations' signals in the Distant Markets without Nexstar's express consent as alleged herein;

C.     That the Court issue a temporary restraining order enjoining, restraining, and prohibiting Time Warner and its officers, agents, servants, employees, parents, subsidiaries, and affiliates and all those in active concert or participation with them, from infringing Nexstar's exclusive rights under the Copyright Act by retransmitting Nexstar's

251510.2

broadcasts in the Distant Markets without Nexstar's express consent and from engaging in the conduct described above;

D. That the Court issue, upon hearing, a preliminary injunction enjoining, restraining, and prohibiting Time Warner and its officers, agents, subsidiaries, parents, affiliates, servants, and employees, and all those in active concert or participation with them, from infringing Nexstar's exclusive rights under the Copyright Act by retransmitting Nexstar's broadcasts in the Distant Markets without Nexstar's express consent and from engaging in the conduct described above;

E. That the Court issue, upon a final trial, a permanent injunction enjoining, restraining, and prohibiting Time Warner and its officers, agents, subsidiaries, parents, affiliates, servants, and employees, and all those in active concert or participation with them, from infringing Nexstar's exclusive rights under the Copyright Act by retransmitting Nexstar's broadcasts in the Distant Markets without Nexstar's express consent and from engaging in the conduct described above;

F. That the Court award Nexstar its actual and consequential damages as determined at trial on the merits;

G. That the Court award Nexstar its damages, including actual damages or statutory damages pursuant to 17 U.S.C. §§ 504;

H. That the Court award Nexstar its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505, Tex. Civ. Prac. & Rem. Code § 38.001, and other applicable law; and

I. That the Court award such other and further relief as the Court shall deem just and appropriate.

251510.2

## VERIFICATION

STATE OF TEXAS )
COUNTY OF DALLAS )
_____ )

     Before me, the undersigned Notary Public, on this day personally appeared Elizabeth Ryder, who, after being duly sworn, stated under oath that she is a representative of plaintiff in this action; that she is authorized to make this Verification on plaintiff's behalf; that she has read the above Complaint; and that every factual statement regarding her conduct and the conduct of others observed by her contained in the Complaint is within her personal knowledge and is true and correct and that every other statement of fact contained in the Complaint is based upon information and belief and is to the best of her knowledge true and correct.

Elizabeth Ryder
Vice President & General Counsel
Nexstar Broadcasting, Inc.


     SUBSCRIBED AND SWORN TO BEFORE ME on this 16th day of July, 2012, to certify which witness my hand and official seal.


Notary Public

KIMBERLY ANN NORTON
Notary Public, State of Texas
My Commission Expires
January 27, 2014

25

DATED:  July 16, 2012

Mark L. Johansen
Texas State Bar No. 10670240
Michael J. Lang
Texas State Bar No. 24036944
Christopher J. Simmons
Texas State Bar No. 24058796

**GRUBER HURST JOHANSEN HAIL
SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone:  (214) 855-6800
Facsimile:  (214) 855-6808

*Attorneys for Plaintiff Nexstar
Broadcasting, Inc.*

Matthew L. Cantor
New York State Bar No. 2740918
A. Owen Glist
New York State Bar No. 4020186
David A. Scupp
New York State Bar No. 4380796

**CONSTANTINE CANNON LLP**
335 Madison Avenue, 9th Floor
New York, New York  10017
Telephone:  (212) 350-2700
Facsimile:  (212) 350-2701

*Application for admission pro hac vice
to be filed*

251510.2



# EXHIBIT 1

Execution Copy

# RETRANSMISSION CONSENT AGREEMENT

This Retransmission Consent Agreement ("Agreement") is made as of this 30th day of June, 2009 by and among Nexstar Broadcasting, Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and Four Points Media Group Holding LLC ("Four Points") (Nexstar, Mission and Four Points, collectively, "Owner") and Time Warner Cable Inc. ("Operator").

WHEREAS, Nexstar, Mission and Four Points are owners and the Federal Communications Commission ("FCC") licensees of the television broadcast stations as set forth on Exhibit A hereto, as such may be amended from time to time pursuant hereto (each a "Station" and collectively, the "Stations").

WHEREAS, the parties desire to have the Stations' broadcast signals retransmitted over the Systems (as defined below).

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements set forth herein, the parties agree as follows:

**Definitions:**

(a)    "Act" means the Communications Act of 1934, as amended.

(b)    "FCC" means the Federal Communications Commission.

(c)    "FCC Rules" means the rules of the Federal Communications Commission.

(d)    "Primary Program Transport Stream" shall mean that primary Program Transport Stream (as defined below) contained in a Signal (as defined below) that includes, in pattern, all programming delivered by the broadcast television network with which a Station is primarily affiliated ("Network") to its local affiliates as its primary national Network feed.  The Network with which each Station is affiliated is indicated on Exhibit A.

(e)    "Program-related Material" shall mean (1) simultaneous closed-captioning data for the hearing impaired for the program then being broadcast, (2) up to one simultaneous second language audio for the program then being broadcast; (3) material essential to or necessary for the delivery or distribution of such Signal pursuant to then-applicable Advanced Television Systems Committee ("ATSC") standards, (4) Program Identification Codes (as defined below); (5) V-chip parental control advisory information of the program then being transmitted; and (6) any material that is specifically identified by the FCC as program-related material that the FCC expressly requires a cable operator retransmitting the digital broadcast signal of a television station pursuant to the FCC's must carry rules to retransmit as part of such digital broadcast signal, in each case that is provided as an integral part of the relevant programming and without charge to Operator, any System or any System subscriber.  "Program Identification Code" shall mean each of, a program identification code in line 21 of the vertical blanking interval and up to one other program identification material in the audio subcarrier of the Signal (or the digital equivalents thereto) that provides audience viewership measurement functionality for

determining ratings and both (i) has no purpose (and facilitates no purpose) whatsoever other than serving as a ratings measurement tool, and (ii) is generally accepted throughout the broadcast television industry as a ratings measurement tool.

(f)    "Program Transport Stream" shall mean a full-motion video stream and the related audio portion thereof that is contained within a Station's Signal.

(g)    "System" means a multichannel video distribution system that is owned, operated or managed by: (i) any of Operator, Time Warner Entertainment Company, L.P. ("TWE"), Time Warner NY Cable LLC ("TWNY"), Time Warner Entertainment-Advance/Newhouse Partnership ("TWEAN"); (ii) any affiliate or wholly-owned subsidiary of TWC, TWNY or TWEAN; or (iii) any other corporation, partnership, joint venture, trust, joint stock company, association, unincorporated organization (including a group acting in concert) or other entity as to which any one or more of Operator, TWE, TWNY or TWEAN directly or indirectly possesses the power to direct or cause the direction of such entity's management and policies, whether through the ownership of voting securities, by contract, management agreement or otherwise.

(h)    "Upgraded System" shall mean a System that has an activated bandwidth of at least 750 MHz, and has launched and distributes (on a non-test basis) the over the air digital broadcast signal (in a digital format) of any other local full-power commercial broadcast television station.

1.    **Retransmission Consent.**  Owner hereby gives Operator its consent, pursuant to Section 325(b) of the Act and the FCC Rules, to the nonexclusive retransmission of the entire broadcast signal of each Station (the "Signal") over each System pursuant to the terms of this Agreement.  Operator agrees to retransmit the Stations' Signals subject to the requirements of Section 2 below.  With respect to each Station that is a low power station, Owner and Operator acknowledge and agree that this Agreement represents a negotiated license between the parties covering, and Owner hereby grants, retransmission rights for all copyrighted works carried by the Station for the entire broadcast for each day of each copyright accounting period covered by the Term of this Agreement, thereby superseding the compulsory license requirements in Section 111 of the Copyright Act ("Compulsory License Requirements") that would otherwise be applicable to Operator's retransmission of the Signal, and Owner further represents, warrants and covenants to Operator that such license grant covers distribution and exhibition rights for copyrighted works included as part of the Signal for the entire broadcast for each day of the Term.

2.    **Carriage.**

(a)    Subject to Section 3 below, each Upgraded System that is located in the Television Market (as defined by the FCC Rules) of a Station shall retransmit, at its own expense, such Station's Primary Program Transport Stream, the Required Stream for such System (if any, as set forth on Exhibit A) (subject to applicable notice requirements), and to the extent technically feasible, the Program-related Material relating thereto, without interruption, additions, insertions, alterations or deletions.  Each such System shall carry the Primary Program Transport Stream of each applicable Station on the same tier of service as all other local full-power Big Four Network affiliated (as defined in Exhibit B) signals are carried in such System.  At no time during the Term shall System charge its subscribers a separate fee to receive the

Signal; provided, however, the foregoing shall not prohibit Operator or any System from charging subscribers for the tier or level of service on which the Signal is carried and/or any equipment which may be required by such Subscribers to receive the Signal (*e.g.* set-top boxes, security cards, etc.). The System shall inform its subscribers of the channel location on which the Station's Signal is being carried.

(b)     Downconversion. In each System (whether it is an Upgraded System or not) located within a Station's Television Market, Operator will downconvert to an analog format the Primary Program Transport Stream of the Signal of each Station and retransmit such downconverted Primary Program Transport Stream until the earliest of: (i) such time as there no longer are any analog subscribers in the applicable System, (ii) such time as Operator ceases downconverting to analog format the signals of all other local full-power Big Four Network broadcast stations carried by such System; and (iii) such time as the FCC Rules no longer require Operator to downconvert to analog format the digital broadcast signals of "must carry" stations carried by such System.

(c)     Subject to Section 2(e) below, each applicable Upgraded System within a Station's Television Market shall retransmit in HDTV format the applicable Station's Primary Program Transport Stream so long as such is delivered to such System in HDTV Format in accordance with the terms of this Agreement.

(d)     Multiplexed Programming.  All portions of the Signal shall be contained within a maximum 19.4 megabit per second data stream and may, in Station's sole discretion, consist of one or more channels of full screen video and audio programming in HDTV format and/or one or more channels of full-screen video and audio programming in non-HDTV format ("Multiplexed Programming").  Except as set forth in Section 2(a) above, Operator shall not be obligated to carry any Multiplexed Programming.  Should Station determine to offer additional Multiplexed Programming, Station and System shall negotiate in good faith with respect to whether and on what terms Operator will carry any additional Multiplexed Programming.

(e)     HDTV Minimum. Notwithstanding anything to the contrary herein, if the Primary Program Transport Stream of a Station fails to satisfy the HDTV Minimum (as defined below), Operator may elect to carry, on a system-by-system basis, the Primary Program Transport Stream in standard definition format version only (whether down-converted by Operator or otherwise) in lieu of the HDTV Format version, if any. Each Station shall provide the applicable Systems with all HDTV Format programming from the Signal that it provides to any other distributor of such Station.  The "HDTV Minimum" shall mean that a Primary Program Transport Stream includes in HDTV Format (i) substantially all of the programming provided in HDTV by the Network of the applicable Station to its local affiliates; and (ii) programming produced in HDTV Format for at least fifty percent (50%) of daily Prime Time (as defined in §76.5(n) of the FCC Rules). "HDTV Format" shall mean a minimum resolution of 720p (1280 x 720 progressive).

(f)     Channel Position.  Operator may make the Primary Program Transport Stream (and any other additional Program Transport Streams contained in the Signal that Operator elects or is required to carry hereunder) available on any one or more channel positions

- 3 -

in each system's lineup, provided that, and for so long as, each Station is affiliated with a Big Four Network, the CW network or MyNetworkTV network (or any comparable successor national broadcast network), each applicable System shall make the Primary Program Transport Stream of such Station available on a channel in the same "neighborhood" as, or in a manner consistent with, the channel position of the primary program transport streams of the other local Big Four Network affiliated stations carried in such System. Each Program Transport Stream that is retransmitted by a System will appear as a separate channel from a subscriber's perspective.

　　　　3.　　**Delivery of Signal(s).**  Each Station shall deliver over-the-air or via fiber to each of the Systems a good quality signal in a manner such that the technical strength and quality of the video and audio components of the Signals, as delivered to the Systems, meet or exceed FCC "good quality" standards applicable to digital television broadcast stations.  Operator shall have the right to (i) digitize, downconvert, compress, remodulate, reformat and otherwise technologically manipulate the Signals and statistically multiplex the Signals with other signals (collectively, "Remodulation") so long as such Remodulation does not materially degrade the quality of the Signals that are then-carried by Operator from a reasonable viewer's perspective and such Remodulated Signal is of a quality at least comparable to the Remodulated Signals of other local Big Four Network signals carried by the System as related to the quality of signal provide by Station compared with the quality of the signal provided by other local Big Four Network stations, (ii) transmit the Signals as so Remodulated among Systems by any means now known or hereafter developed, and (iii) retransmit the Signals (whether in the format delivered as of the date hereof or in any other format now known or hereafter developed), as so Remodulated. Nothing contained herein shall restrict Operator or any System from using any or all of the signal distribution capacity contained within the bandwidth of the Signal(s) from the point of their reception by Operator, including without limitation any capacity that may be created or made useable as a result of the compression or other technical manipulation by Operator of the Signal(s) (other than the bandwidth used at any given time for the primary video and accompanying primary audio portion of the Signal(s) and Program-related Material) ("Ancillary Signal Capacity"), by any means and for any purpose, so long as such use does not materially degrade or materially interfere with the quality of the primary video and accompanying primary audio of the Signal(s) from a reasonable viewer's perspective. Owner covenants and agrees that neither it nor any Station shall use any part of Operator's or any System's physical plant for a return path for any reason whatsoever, including without limitation, for any "trigger" or other interactive signal or information, without Operator's prior written consent.  Owner or the applicable Station shall provide Operator with ninety (90) days' prior written notice of the inclusion of any Material other than Program Transport Streams and Program-related Material ("Other Material") in or around the Signal and prompt written notice of the movement of any Material within the Signal, which notice shall describe with specificity the applicable Material and the technical placement of same within the Signal.  Station covenants and agrees that any Other Material shall be easily extracted, removed or blocked with equipment then existing and available in the Systems without impeding, interfering with or degrading the audio or visual quality of the Signal(s) and shall not be embedded into or around any portion of the Signal in which any Program Transport Stream or Program-related Material is transmitted. Notwithstanding anything herein to the contrary, any degradation or interference with the programming contained in the Signal or the quality of distribution caused by such efforts to

remove or block such Material will not constitute a breach hereof. Operator shall have the right to strip or block any and all data, information, images, sounds or other material that is not the primary video and accompanying audio of a Program Transport Stream Operator is required to carry hereunder or Program-related Material related thereto.

4.    **Term**.    The term of this Agreement shall be for a period of five years commencing July 1, 2009 and ending June 30, 2014 (the "Term").

5.    **Start Over/Look Back/VOD**.    Owner hereby grants to Operator certain Start Over, Look Back and VOD rights, as such terms are defined in and in accordance with Exhibit C attached hereto, with respect to each Station.

6.    **Consideration**.    Operator agrees to provide to Owner the additional consideration set forth in Exhibit B.

7.    **Copyright, Trademarks and Unauthorized Use**.    Operator acknowledges that, except as otherwise set forth herein (e.g., with respect to Start Over, Look Back, VOD and low power stations), the retransmission right granted herein to each Station's Signal does not convey any license or sublicense in or to the copyrights of and to the underlying programming transmitted by the Station, or to the marks, names and logos that may be used therein; and that, as between the parties, except as set forth herein, it shall remain the obligation of Operator to obtain any necessary licenses for retransmission on the System, whether under compulsory copyright license pursuant to 17 U.S.C. §111, or otherwise. Operator may discontinue carriage of the Signal of any Station at any time with respect to any System(s) or portion(s) thereof if the compulsory copyright license pursuant to 17 U.S.C. §111 is no longer available, or if the cost of such compulsory license with respect to any System(s) is materially increased, or Operator's copyright liability is otherwise increased by a material amount. If, as a result of Operator's retransmission of the Signal(s) hereunder, Operator would incur higher compulsory copyright license royalty obligations pursuant to 17 U.S.C. § 111 than Operator would in the absence of the carriage of such Signal(s), Owner shall provide such Signal(s) on a copyright-paid basis or shall indemnify Operator for any such obligations or Operator shall have the right to discontinue carriage of such Signal. Owner agrees that it shall not, directly or indirectly, lobby for, petition for or otherwise seek any increase in the rates Operator is obligated to pay, pursuant to the Compulsory License (or its successor) with respect to Operator's carriage or retransmission of broadcast stations' signals. Except as specifically permitted herein or as necessary to exercise rights granted herein, no System shall, for pay or otherwise, record copy, duplicate, retransmit or expressly authorize the recording, copying, duplication or retransmission of any portion of the Stations' Signals without Owner's prior written consent; provided, however, that the foregoing shall not be deemed to prohibit Operator or any System from undertaking any activity that is not prohibited by applicable law in the absence of a license, and provided further this Section 7 does not restrict the practice of connecting distribution cables to Operator's subscribers' DVRs or other similar devices intended for private duplication of video or audio programming.

8.    **Syndicated Exclusivity/Network Non-Duplication**.    Operator agrees that to the extent it receives from a Station a valid network non-duplication and/or syndicated exclusivity notice pursuant to, and in full compliance with, all applicable FCC Rules, it shall provide

syndicated exclusivity and/or network non-duplication protection (as applicable) to the extent required by the FCC Rules; provided that, notwithstanding anything to the contrary, in the event Operator fails to provide such protection, Owner shall in no event be entitled to terminate this Agreement based on such failure, provided further that if Owner provides Operator with written notification of a System's failure to provide such required protection and such System fails to provide such required protection within thirty (30) days, Owner may suspend its grant of retransmission consent hereunder until such time as such System provides such required protection. No Station shall exercise, nor shall Operator be obligated to implement, any syndicated exclusivity or network non-duplication protection against any other station retransmitted by a System unless Station also exercises such protection rights with respect to all other distributors in the operating area of such System.

9.    **Representations, Warranties and Indemnities.**

(a)    Owner represents, warrants and covenants to the Operator that (i) Owner is, and the Stations are owned by, a corporation, limited liability company, partnership or limited partnership duly organized and validly existing under the laws of the state of jurisdiction of its creation and qualified to transact business and in good standing under the laws of the state of jurisdiction of its creation and qualified to transact business in the states where the Stations broadcast; (ii) Owner has the requisite power and authority to enter into this Agreement and to fully perform its obligations hereunder; (iii) Owner is under no contractual or other legal obligation which shall in any way interfere with its full, prompt and complete performance hereunder; (iv) the individual executing this Agreement on behalf of Owner and the Stations has the authority to do so; (v) Owner has and will have right to grant the licenses granted hereunder free and clear of any and all claims by any third party; and (vi) each Station is, and will throughout the Term remain, validly licensed by the FCC.

(b)    Operator represents, warrants and covenants to the Owner that (i) Operator is, and the Systems are owned by, a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and qualified to transact business and are qualified to transact business in the states where the Systems operate, (ii) Operator has the requisite power and the authority to enter into this Agreement and to fully perform its obligations hereunder, (iii) Operator is under no contractual or other legal obligation which shall in any way interfere with its full, prompt and complete performance hereunder; (iv) the individual executing this Agreement behalf of Operator and the Systems has the authority to do so.

(c)    Operator and Owner shall each indemnify, defend and forever hold harmless the other, the other's affiliates (including controlling persons and related companies), owners, officers, directors, partners, shareholders, employees and agents ("Related Entities"), against and from all third party liabilities, claims, costs, damages, losses, settlements, actions, suits, proceedings, investigations, judgments, awards, and expenses (including, without limitation, reasonable counsel fees, disbursements and court and administrative costs) (collectively, "Losses" and, individually, a "Loss") that are sustained or incurred by or asserted against any of them and that arise out of a breach or alleged breach of this Agreement or any violation of applicable law or FCC Rules by the other. Owner shall further indemnify Operator and its Related Entities against any Losses in connection with the content of the Signal(s), the

- 6 -

programming contained therein or Operator's carriage thereof (including, without limitation, any Loss arising out of libel, slander, defamation, indecency, obscenity, invasion of right of privacy or infringement or violation of copyrights, dramatic or non-dramatic music rights, trademark rights, patent rights, literary or music synchronization rights, obscenity or any other form or forms of unprotected speech or otherwise arising out of the contents of the Stations' Signal(s)). And each shall reimburse the other for any and all legal, accounting and other fees, costs and expenses reasonably incurred by any of them in connection with investigating, mitigating or defending any such Loss. The indemnities contained in this Section 8(c) shall survive the expiration or termination of this Agreement.

10. **Force Majeure**. Neither party shall have any rights against the other party hereto for any delay, preemption or other failure to perform when such delays, preemptions or failures are due to an act of God, inevitable accident, fire, lockout, flood, tornado, hurricane, strike or other labor dispute, act of government or governmental instrumentality (whether federal, state or local), failure of performance by a common carrier, failure in whole or in part in technical facilities, or any other cause (financial inability excepted) beyond such party's reasonable control. In the event of any such delay, preemption or failure, the affected performing party shall promptly notify the other party of the nature and anticipated length of continuance of such force of nature, and during such period both parties shall be excused from performance.

11. **Termination**.

(a) Either party may terminate this Agreement by giving the other party written notice, if the other party has materially breached this Agreement, and such breach is not cured within thirty (30) days of receipt of such notice; provided, that if such breach is confined to a System or to a limited number of Systems, or to a particular Signal (or component feed thereof) of one or a limited number of Stations, then the non-breaching party shall have the right to terminate this Agreement only as to the affected System(s), Station(s) or Signal(s) (or component feed(s) thereof), as the case may be; and, provided, further, that if such breach giving rise to the right of termination cannot reasonably be cured within thirty (30) days, but the party seeking to cure such breach has commenced good-faith efforts to cure such breach, then the cure period will be extended for an additional thirty (30) days. Termination of this Agreement is in addition to any other rights or remedies that may be available to the terminating party.

(b) Operator may discontinue carriage of any Program Transport Stream of any Station if: (i) such Program Transport Stream ceases to be a broadcast affiliate of the Network listed across from it on Exhibit A, a Big Four Network, the CW Network ("CW") or the MyNetwork TV network ("MYTV") (or comparable successor national broadcast network), provided that in the event a Primary Program Transport Stream of a Station ceases to be the local broadcast affiliate of a Big Four Network, CW or MYTV, Operator shall have no obligation to downconvert such Primary Program Transport Stream to analog format; (ii) such Program Transport Stream becomes a Shopping Station; or (iii) the System carrying such Program Transport Stream is located outside such Station's Television Market. Owner shall give Operator no less than ninety (90) days' prior written notice of any loss or change of the Network affiliation by any Station, or of any Program Transport Stream of any Station becoming a Shopping Station. For the purpose of this Section, a "Shopping Station" shall be a Program

- 7 -

Transport Stream that consists of or contains "home shopping," "infomercial," "advertorial" or other paid programming ("Paid Programming") in anything other than the following periods: (x) 12 a.m. to 6 a.m. daily; (y) up to two (2) hours per day Monday through Sunday; and (z) up to five (5) additional hours in any given month; provided that, no such programming shall appear during Prime Time (as defined by 76.5(n) of the FCC Rules). The parties acknowledge and agree that occasional programming of local interest or charitable purpose (e.g. Jerry Lewis telethon, Billy Graham specials) for which a Station may receive a programming fee shall not be deemed Paid Programming hereunder.

12.     **After-Acquired Stations**.  In the event that Owner becomes the majority owner, operator and licensee of a full-power broadcast television station, or a station becomes an Included LMA (as defined in Exhibit D) after the date of this Agreement ("Acquired Station"), such additional station shall be deemed a Station under this Agreement, and shall be deemed added to Exhibit A; provided that if such Acquired Station has elected "must-carry" status with respect to a System for the then-current term, then such "must carry" status shall govern such Acquired Station and no fees shall be due hereunder until the expiration of the then-current retransmission consent cycle, after which point such Acquired Station shall be governed by the terms hereof. Notwithstanding the foregoing, no station may be added to this Agreement as an Included LMA without Operator's prior written consent: (a) until the earlier of (i) January 1, 2011, or (ii) the expiration of any agreement pursuant to which Operator carries such station; and (b) if the inclusion of such station would cause the number of Station Subscribers of Included LMAs carried pursuant to this Agreement to exceed 550,000 ("LMA Threshold"). In the event that Nexstar wishes to add a station hereunder as an Included LMA and the result of such addition would exceed the LMA Threshold, the parties agree to enter into good faith discussions with respect to whether Operator will consent to such addition. Owner shall provide Operator at least thirty (30) days' prior written notice of any station that will be added to this Agreement pursuant to the terms of this paragraph.

13.     **Assignment**.  Except as permitted or required below, this Agreement may not be assigned by either party without the prior written consent of the other, which shall not be unreasonably withheld or delayed. In the event of any valid assignment of this Agreement, the assigning party shall be relieved of all obligations arising thereafter with respect to the one or more applicable Systems or Stations and the other party shall look solely to the assignee for enforcement of such obligations. Notwithstanding the foregoing sentence:

(a) Either party may assign this Agreement with respect to, as applicable, one or more Systems or Stations, to any company affiliated with the assigning party;

(b) In the event that Owner sells, assigns or otherwise divests substantially all of the assets of a Station after the Effective Date, then the rights and obligations of this Agreement shall apply to such acquiring party notwithstanding anything to the contrary that is contained in any agreement between Owner and the acquiring party, unless Operator has an existing effective agreement with the acquiring party or the applicable station that would otherwise govern the carriage of such station(s) by Operator, and Operator agrees to the addition of such station(s) to such other agreement within ten (10) business days after receiving notice regarding such sale,



assignment or divestiture. In such event, Owner will no longer have any obligations hereunder with respect to such Station(s) as of the date of such sale, assignment or divestiture;

(c) Operator may assign this Agreement to any entity acquiring all or substantially all of the assets of Operator or any System(s). Notwithstanding anything herein to the contrary, if Operator or any affiliated entity sells, transfers, assigns or otherwise disposes of its ownership interest in a System (or part thereof), or otherwise ceases operation of a System (or part thereof), then Operator's obligations hereunder shall terminate with regard to such System (or part thereof) as of the effective date of such sale, transfer, assignment, cessation or other disposition, and Operator shall have no continuing liability for performance of the terms hereof with regard to such system (or part thereof);

(d) Notwithstanding the foregoing, the parties acknowledge and agree that the right to add broadcast stations to this Agreement as Included LMAs pursuant to Section 12 and Exhibit D shall reside personally in Nexstar and in no event shall any assignee or transferee of this Agreement be permitted to add any station to this Agreement as an Included LMA without Operator's written consent.

14.     **Included LMA Station Termination**. In the event that any Included LMA added to this agreement after the date of execution subsequently no longer satisfies the criteria for an Included LMA station, Operator shall have the right, but not the obligation, to terminate this Agreement with respect to such Included LMA upon sixty (60) days prior written notice to the FCC licensee of such station. Notwithstanding the foregoing, any such termination by Operator shall not otherwise affect the other Stations governed by this Agreement and this Agreement shall, except as so terminated, remain in full force and effect, and if Operator elects not to terminate this Agreement with respect to such Included LMA, this Agreement shall remain in full force and effect with respect to such Included LMA.

15.     **Waiver**. No waiver of this Agreement or any claim shall be deemed to have occurred, nor shall any breach be deemed excused, unless the waiver or excuse is in writing and signed by the party against whom the waiver or excuse is to be asserted.

16.     **Notices**. All notices, demands, requests or other communications which may be or are required to be given, served or sent by any party to any other party pursuant to this Agreement shall be in writing and shall be mailed or transmitted by hand, by registered or certified mail, return receipt requested, postage prepaid, or by an national overnight delivery service, with all postage or delivery charges prepaid, to the respective addresses listed below, or such other address as may be specified in writing by the party to whom the notice is to be given.

To Owner:

Nexstar Broadcasting, Inc.
Mission Broadcasting, Inc.
Four Points Media Group Holding LLC

c/o Nexstar Broadcasting Group, Inc.
5215 N. O'Connor Blvd.
Suite 1400
Irving, TX 75039
Attention:  Chief Executive Officer
with a copy to Vice President and General Counsel

To Operator:

Time Warner Cable Inc.
60 Columbus Circle
New York, NY 10023
Attention:  Executive Vice President and Chief Programming Officer,
with a copy to Executive Vice President and General Counsel

Each notice transmitted in the manner described in this Section shall be deemed to have been given, received and become effective for all purposes (i) at the time it shall have been delivered to the addressee as indicated by the return receipt, the affidavit of the messenger, or the records of the overnight delivery service or (ii) three (3) days after presented for delivery to the addressee as so indicated during normal business hours, if such delivery shall have been refused for any reason.

17.    **Applicable Law**.  This Agreement shall be governed by and construed under and in accordance with the laws of the State of Texas subject to applicable provisions of the Act and the FCC Rules.  The provisions of this Section shall survive the termination of this Agreement.

18.    **Confidentiality**.  Neither System nor Station shall disclose to any third party (other than its respective employees, in their capacity as such) the terms of this Agreement (other than its existence and Term) or any other confidential information provided by one party to the other during the Term of this Agreement.  Neither System nor Station shall disclose to any third party (other than its respective employees, in their capacity as such), any confidential business information concerning the other derived in the course of performance, including, but not limited to, any information relating to identification of subscribers or financial material, except: (i) to the extent necessary to comply with law or a valid order of a court of competent jurisdiction, in which event the party making such disclosure shall so notify the other as promptly as practicable (and, if possible, prior to such disclosure); (ii) as part of its normal reporting to or review procedure of its parent company, its auditors and its attorneys; <u>provided</u>, <u>however</u>, that such parent company, auditors and attorneys agree to be bound by the provisions of this Section; (iii) in order to enforce its rights pursuant to this Agreement; and (iv) if mutually agreed by the Parties in writing.

19.    <u>**No Joint Venture or Principal-Agent Relationship; No Station Relationship**</u> <u>**with Subscribers**</u>.  Nothing in this Agreement shall create any joint venture or principal-agent relationship between Station and System.  No subscriber shall be deemed to have any direct or indirect contractual relationship with Station by virtue of this Agreement, nor shall any subscriber be deemed to be a third party beneficiary of this Agreement.

- 10 -

20.   **Severability**.   The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement.

21.   **Counterparts**.  This Agreement may be executed in counterparts and delivered via facsimile or electronic mail, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement.

22.   **Captions and Headings**.  Captions and headings used in this Agreement are for convenience only and shall not be deemed to be part of this Agreement.

23.   **Entire Agreement**.   This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous, express or implied, written or oral agreements, representations and conditions between the parties with respect thereto.

[SIGNATURE PAGE FOLLOWS]

- 11 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**Time Warner Cable Inc.**

By: _____
Name: Melinda C. Witmer
Title: EVP and Chief Programming Officer

**Nexstar Broadcasting, Inc.**

By: _____
Name:  Elizabeth Hammond
Title:  Vice President and General Counsel

**Mission Broadcasting, Inc.**

By: _____
Name:  Dennis Thatcher
Title:  Chief Operating Officer

**Four Points Media Group Holding LLC**

By: _____
Name:
Title:

- 12 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**Time Warner Cable Inc.**

By:_____
Name: Melinda C. Witmer
Title: EVP and Chief Programming Officer

**Nexstar Broadcasting, Inc.**

By: *Elizabeth Hammon*
Name:  Elizabeth Hammond
Title:  Vice President & General Counsel

**Mission Broadcasting, Inc.**

By: _____
Name:  Dennis Thatcher
Title:  Chief Operating Officer

**Four Points Media Group Holding LLC**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**Time Warner Cable Inc.**                    **Nexstar Broadcasting, Inc.**

By:_____          By:_____
Name: Melinda C. Witmer                     Name:  Elizabeth Hammond
Title: EVP and Chief Programming Officer     Title:  Vice President & General Counsel

**Mission Broadcasting, Inc.**                **Four Points Media Group Holding LLC**

By: _____          By: _____
Name:  Dennis Thatcher                        Name:
Title:  Chief Operating Officer               Title:

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

**Time Warner Cable Inc.**

By:_____
Name: Melinda C. Witmer
Title: EVP and Chief Programming Officer

**Nexstar Broadcasting, Inc.**

By:_____
Name:  Elizabeth Hammond
Title:  Vice President & General Counsel

**Mission Broadcasting, Inc.**

By: _____
Name: Dennis Thatcher
Title:  Chief Operating Officer

**Four Points Media Group Holding LLC**

By: _____
Name:   ROBERT G. WALDEN
Title:   DIRECTOR

**EXHIBIT A**

**Stations as of the Effective Date**

| Station | Affiliation | Market | Licensee/Owner |
|---|---|---|---|
| KTAB | CBS | Abilene, TX | Nexstar |
| KRBC | NBC | Abilene, TX | Mission |
| KAMR | NBC | Amarillo, TX | Nexstar |
| KCPN-LP* (KAMR-DT 2) | MNT | Amarillo, TX | Mission |
| KCIT | FOX | Amarillo, TX | Mission |
| KEYE | CBS | Austin, TX | Four Points |
| KBTV | FOX | Beaumont, TX | Nexstar |
| KSVI | ABC | Billings, MT | Nexstar |
| KHMT | FOX | Billings, MT | Mission |
| WCFN | MNT | Champaign-Springfield, IL | Nexstar |
| WCIA | CBS | Champaign-Springfield, IL | Nexstar |
| WDHN | ABC | Dothan, AL | Nexstar |
| WJET | ABC | Erie, PA | Nexstar |
| WFXP | FOX | Erie, PA | Mission |
| WTVW | FOX | Evansville, IN | Nexstar |
| KFTA | FOX | Ft. Smith/ Fayetteville, AR | Nexstar |
| KNWA | NBC | Ft. Smith/ Fayetteville, AR | Nexstar |
| WFFT | FOX | Ft. Wayne, IN | Nexstar |
| WLYH[1] | CW | Harrisburg/Lancaster/Lebanon/York, PA | Nexstar |
| WCWJ | CW | Jacksonville, FL | Nexstar |
| WTAJ | CBS | Johnstown-Altoona, PA | Nexstar |
| KSNF | NBC | Joplin, MO | Nexstar |
| KODE | ABC | Joplin, MO | Mission |
| KARK | NBC | Little Rock-Pine Bluff, AR | Nexstar |
| KARZ | MNT | Little Rock-Pine Bluff, AR | Nexstar |
| KLBK | CBS | Lubbock, TX | Nexstar |
| KAMC | ABC | Lubbock, TX | Mission |
| KARD | FOX | Monroe, LA - El Dorado, AR | Nexstar |
| KTVE | NBC | Monroe, LA - El Dorado, AR | Mission |
| KMID | ABC | Odessa-Midland, TX | Nexstar |
| WMBD | CBS | Peoria, IL | Nexstar |
| WLWC | CW | Providence, RI | Four Points |
| WROC | CBS | Rochester, NY | Nexstar |
| WQRF | FOX | Rockford, IL | Nexstar |
| WTVO | ABC | Rockford, IL | Mission |
| KUTV | CBS | Salt Lake City, UT | Four Points |
| KUSG | This TV | Salt Lake City, UT | Four Points |
| KLST | CBS | San Angelo, TX | Nexstar |
| KSAN | NBC | San Angelo, TX | Mission |
| KTAL | NBC | Shreveport, LA | Nexstar |

- 13 -

| KSFX | FOX | Springfield, MO | Nexstar |
|---|---|---|---|
| KOLR | CBS | Springfield, MO | Mission |
| KQTV | ABC | St. Joseph, MO | Nexstar |
| WTWO | NBC | Terre Haute, IN | Nexstar |
| WFXW | FOX | Terre Haute, IN | Mission |
| WFXV | FOX | Utica, NY | Nexstar |
| WUTR | ABC | Utica, NY | Mission |
| WPNY-LP* (WUTR-DT 2) | MNT | Utica, NY | Nexstar |
| WHAG | NBC | Washington DC--Hagerstown | Nexstar |
| WTVX | CW | West Palm Beach, FL | Four Points |
| WTCN-CA* (WTVX-DT 2) | MNT | West Palm Beach, FL | Four Points |
| WWHB-CA* (WTVX-DT 3) | TVA | West Palm Beach, FL | Four Points |
| WTVX-DT 4 | RTN | West Palm Beach, FL | Four Points |
| KFDX | NBC | Wichita Falls, TX | Nexstar |
| KJBO-LP* (KFDX-DT 2 ) | MNT | Wichita Falls, TX | Mission |
| KJTL | FOX | Wichita Falls, TX | Mission |
| WBRE | NBC | Wilkes-Barre Scranton, PA | Nexstar |
| WYOU | CBS | Wilkes-Barre Scranton, PA | Mission |

*Denotes a low power Station whose signal is simulcast as Multiplexed Programming in the Signal of a full power Station.

[1]As of the date hereof, pursuant to an agreement between Nexstar and Newport Television ("Newport"), retransmission consent for WLYH is negotiated by Newport.

In addition to the signals of low power stations that are also carried as multicast program streams of a Station as indicated above, the following multicast streams are contained with the Signal of a Station, as listed below:

| Station/stream | Multicast network |
|---|---|
| KEYE-DT 2 | RTN[2] |
| WTVO- DT 2 | MNT |
| KUTV 2 | This TV |

[2]Four Points plans to convert the KEYE-DT 2 Program Transport Stream into a Telemundo affiliated stream shortly after the execution date of this Agreement and will provide Operator notice of the exact date of such change. Upon the effective date of such change, but subject to applicable notice requirements, Operator will provide the KEYE-DT 2 Telemundo Programming Transport Stream on a channel mutually agreed upon by the parties that is in the channel neighborhood of comparable programming services.

"Required Stream" means, with respect to Upgraded Systems: (i) wholly located in the Television Market of KEYE, that Program Transport Stream contained within KEYE's Signal that contains, in pattern, all programming transmitted by the Telemundo broadcast network to its

- 14 -

local affiliates as its national network feed; (ii) that Operator acquires during the Term that are wholly located within the Television Market of WTVO, that Program Transport Stream contained within WTVO's Signal that contains, in pattern, all programming transmitted by the MyNetwork TV broadcast network to its local affiliates as its national network feed; and (iii) that Operator acquires during the Term that are wholly located within the Television Market of KUTV, that Program Transport Stream contained within KUTV's Signal that contains, in pattern, all programming transmitted by the This TV broadcast network to its local affiliates as its national network feed.

## EXHIBIT B

### Additional Consideration

1. **Cash Payment**.

    a.    Fees.  Operator shall pay to Station for each calendar month during the Term, a per-Station Subscriber fee (the "Per-Sub Fee(s)") set forth below for each year, as further described and subject to the terms and conditions set forth in this Paragraph 1 of this Exhibit B. The total payments for each month hereunder shall, subject to adjustment as provided herein, be equal to the product of the number of Station Subscribers for such month (as calculated below) multiplied by Per-Sub Fee (such amount, the "Fee(s)").

| Contract Year | Per-Sub Fee |
|---|---|
| July 1, 2009-June 30, 2010 | REDACTED |
| July 1, 2010-June 30, 2011 | |
| July 1, 2011-June 30, 2012 | |
| July 1, 2012-June 30, 2013 | |
| July 1, 2013-June 30, 2014 | |

"Station Subscriber" shall mean each System subscriber located in the Television Market of a Station that is the primary affiliate of the ABC, CBS, Fox or NBC broadcast network (each, a "Big Four Network"); provided that such subscriber actually receives from Operator the Primary Program Transport Stream of such Station containing such network pursuant to this Agreement. Without limiting Operator's rights or remedies pursuant to this Agreement, if Station is no longer primarily affiliated with a Big Four Network or fails to deliver a good quality signal to Operator pursuant to Section 3(a) in the Agreement, this Paragraph 1 shall be of no further force and effect, and Operator shall not be required to pay any consideration for the rights granted by Station under this Agreement until such time as such Station is subsequently affiliated with a Big Four Network or resumes delivery of a good quality signal to Operator.

    b.    Calculation of Fees and Station Subscribers.  Within forty-five (45) days after the end of each calendar month during the Term, Operator shall send to Station a statement that sets forth the total number of Station Subscribers during such month. For purposes of calculating the Fees hereunder, the number of Station Subscribers for the applicable calendar month shall be calculated by adding the number of Station Subscribers as of the first day of the calendar month at issue to the number as of the last day of such calendar month, and dividing the result by two; provided that such result shall be adjusted on a pro rata basis to reflect any portion of such month in which any Station Subscriber(s) do or do not receive Station's Signal; and provided further that any Station Subscriber that receives such Signal on more than one tier, level or basis of service, in more than one format, or more than one signal or Program Transport Stream of Station, shall only count as one Station Subscriber. Station Subscribers in Systems in which Station's Signal is launched following the Effective Date shall be deemed added as of the first day of the month following such addition, and Station Subscribers in Systems in which carriage of any Station is terminated in accordance with the terms of this Agreement, and in Systems that

- 16 -

cease to constitute Operator systems, shall be deemed deducted as of the first day of the month following such deletion or cessation.

c.      Notwithstanding anything contained herein to the contrary, for purposes of calculating the Fees, the number of Station Subscribers for any month shall not include: (i) any person or entity who does not pay, and who is not otherwise expected to pay, any monies to Operator to receive the tier, level or package of service on which the Station's Signal is carried; (ii) any employee of Operator, if such employee is not charged by Operator for the tier, level or package of service on which the Signal is carried; (iii) any specific location at which Operator is monitoring its signal quality or to which designated delivery is recorded merely for identification; (iv) any other location not otherwise required to pay any monies to Operator to receive the tier, level or package of service on which the Signal is carried pursuant to any applicable franchise arrangement or other similar governmental requirements; or (v) Station Subscribers who have not paid their monthly rate to Operator for a given month and are subsequently disconnected.  Owner acknowledges and agrees that Operator may calculate the number of Station Subscribers excluded pursuant to clause (v) in this Paragraph 1(c) based on Operator's past bad-debt experience (*e.g.*, Operator may use a historical average bad debt ratio to calculate the number of "bad-debt subscribers") and may, in lieu of calculating the number of Station Subscribers to be excluded, subtract from the Fees an amount equal to the product of the Fees multiplied by the bad debt percentage for subscription services experienced by Operator.

d.      Bulk Billed Subscribers.  Notwithstanding anything to the contrary in this Agreement, the number of Station Subscribers in multiple unit complexes, including without limitation apartment complexes, condominiums, cooperatives, planned communities and other multiple dwelling complexes, office and business locations, hotels, motels and similar establishments (any such multiple unit complex, an "MDU") that receives service on a bulk- rate basis shall be deemed equal to the total monthly bulk rate charged or otherwise applicable to such MDU for solely the level, tier, package or service on which the Signal is distributed to such MDU (excluding any amounts attributable to equipment charges, franchise fees, taxes or charges for any other tiers or services) (the "Bulk Tier Rate") divided by the standard monthly retail rate charged to a Station Subscriber who is not billed on a bulk rate basis for such level, tier, package or basis of service (excluding any amounts attributable to equipment charges, franchise fees, taxes or charges for any other tiers or services) (the "Standard Tier Rate"). Station acknowledges that Operator may impose on such complexes a single rate (a "Combined Bulk Rate") that is inclusive of the Bulk Tier Rate and one or more of the following: equipment or software charges, franchise fees, taxes or charges for any other tiers or levels of service (each, an "Additional Charge Category").  In such event, Operator may, in lieu of the foregoing formula, calculate the number of Station Subscribers attributable to each such complex by dividing the Combined Bulk Rate by the sum of the Standard Tier Rate plus the standard monthly retail rate charged to a Station Subscriber who is not billed on a bulk-rate basis for each Additional Charge Category included in the Combined Bulk Rate.

e.      Due Date.  The Fees payable hereunder for each month shall be due forty-five (45) days after the end of such month.  In the event of a good faith dispute regarding any Fees, no such disputed Fees shall be due or payable by Operator to Station unless and until such dispute has been resolved to the reasonable satisfaction of Operator.

- 17 -

     f.    <u>Retroactive Adjustments</u>. If payment of the Fees due hereunder for any month has been made, and the amount of such payment exceeds the amount of the Fees that were actually due for such month (regardless of when such adjustment is made), and such adjustment is not the subject of a good faith dispute, then Operator shall have the right to set off against any amounts then or thereafter due to Station (or, upon demand, Station shall pay to Operator) an amount equal to such excess.

     g.    <u>Audit</u>. Upon not less than ninety (90) days' prior written notice, Owner shall have the right during the Term and for one (1) year thereafter, at its cost, to examine during normal business hours and without interfering with the operation of Operator's business, the books and records of Operator that are related directly to the calculation of the Fee; provided, that such examinations shall be conducted by Cable Audit Associates (or any such similar company mutually agreed upon by the parties) not more frequently than once annually, and with respect to any given System not more than once every two years, and that any such examination shall be limited to any Fee made during the then-current calendar year and the prior calendar year. Owner will be deemed to have waived any and all claims it may have with respect to an underpayment of a Fee due unless it gives written notice of such claims to Operator upon the earlier of two (2) years after the date on which payment of such Fee was due or within six (6) months after the completion of the examination in which the underpayment was identified. Owner shall, within three (3) months after the completion of an examination pursuant to this Section, provide Operator with complete copies of all written reports related to such examination (or, if no written reports are generated, a true and complete written description of the findings and conclusions of the examination).

**2.    <u>Advertising Purchase</u>.**

     a.    For so long as Owner and each Station is in material compliance with the terms and conditions of this Agreement and affiliated with its Network, Operator agrees to purchase a schedule of advertising spots and/or sponsorships in an amount equal to REDACTED REDACTED gross (i.e. excluding agency commissions, if any) for each "Contract Year" (i.e., the period from July 1 of a year through June 30 of the following year) during the Term (the "Ad Purchase Commitment"). Such advertising and sponsorship purchases may be placed and allocated in Operator's sole discretion on any Station; provided that no more than one half of the Ad Purchase Commitment may be attributed to advertising purchased on KEYE. Such advertising and sponsorship purchases shall be valued upon then-prevailing best rates for purchases of similar size (based on the aggregate amount of the Ad Purchase Commitment for the Contract Year), day-part and programming. For purposes of clarity, Operator shall not be required to satisfy the Ad Purchase Commitment in the particular month or Television Market in which such commitment accrues, but rather, Operator may purchase advertising and/or sponsorships to run at any time on any Station during the Term; provided, however, Operator will make the full amount of the yearly Ad Purchase Commitment within the applicable Contract Year (e.g., Operator shall purchase REDACTED f advertising spots and sponsorships between July 1, 2009 and June 30, 2010 REDACTED f advertising spots and sponsorships between July 1, 2010 and June 30, 2011, etc.).

b.      With respect to each Contract Year, at Operator's request, each Station will provide Operator with available advertising and sponsorship inventory and shall make such inventory available to Operator for purchase in satisfaction of the Ad Purchase Commitment such that, if desired by Operator, it shall be reasonably evenly spread out throughout each Contract Year.

c.      Within forty-five (45) days following the end of each calendar month in which Operator purchases advertising availabilities and/or sponsorships, Owner shall (or shall cause the Station to) deliver to Operator complete written affidavits of performance identifying the advertising spots and/or sponsorships that aired, the day parts during which such spots and/or sponsorships aired and the dollar amount attributed to such spots and/or sponsorships.  The parties agree that any advertising paid for or bought by Operator, whether through Operator's local offices or agencies or through Operator's national or regional media sales offices or agencies or otherwise, shall count toward the Ad Purchase Commitment.

d.      Adjustment.  For any broadcast television station the Primary Program Transport Stream of which is affiliated with a Big Four Network and that becomes a Station under this Agreement pursuant to Section 12 of this Agreement ("Acquired Big Four Station"), the amount of the Ad Purchase Commitment shall increase during each remaining Contract Year on a going-forward basis by [REDACTED] per Station Subscriber of such Acquired Big Four Station as of the date immediately after the date such Acquired Big Four Station becomes a Station hereunder.  For any Station that is affiliated with a Big Four Network and that ceases to constitute a Station under this Agreement ("Divested Big Four Station"), the amount of the Ad Purchase Commitment shall be reduced during each remaining Contract Year on a going-forward basis by [REDACTED] per Station Subscriber of such Divested Big Four Station as of the date immediately prior to the date such Divested Big Four Station ceases to be a Station hereunder.  Such increases or decreases shall be pro-rated for the applicable portion of a Contract Year in which a station becomes an Acquired Big Four Station or Divested Big Four Station.

**EXHIBIT C**

**Start Over/Look Back/VOD Terms and Conditions**

1.    <u>Definitions</u>.

      a.    "<u>Start Over</u>" means that functionality, accessible by customers viewing the linear exhibition of a Program Transport Stream, whereby such customers may start viewing a Program (as defined below) that is in progress, from its beginning, at any time during the period of such Program's linear exhibition.

      b.    "<u>Look Back</u>" means that functionality, accessible by customers viewing the linear exhibition of a Program Transport Stream, whereby such customers may access for viewing a Program at any time during the seventy-two (72) hour period after the end time of such Program's linear exhibition.

      c.    "<u>VOD</u>" means that mode of exhibition whereby a viewer may select and view a Program at any time at such viewer's discretion during such Program's access window. Owner may, in its reasonable discretion, determine the access window of each Program; provided, however, that the access window shall be no shorter than the access window that Owner or such Station make available to any other distributor on a VOD basis.

2.    <u>Grant of Rights</u>.  Owner hereby grants to Operator, at no additional cost to Operator or any system, the right to enable Start Over, Look Back and VOD for certain Programs contained in each Station's Signal, including without limitation the right to record each Program from such Signal, and to Remodulate, copy, store, distribute, transmit and exhibit each Program on a Start Over, Look Back and VOD basis.  The Start Over and Look Back functionalities provided by Operator will not include a "fast-forward" feature during the exhibition of a Program for which a subscriber has activated Start Over or Look Back.

3.    <u>Programs</u>.  Owner shall cause each Station to make available, at Operator's sole expense, all programs contained in its Signal that Owner or such Station produces or has produced (*e.g.*, local news programs) for distribution hereunder on a Start Over, Look Back and VOD basis (collectively, the "<u>Programs</u>"), and the "Programs," for Start Over and Look Back purposes, shall also include all programs, if any, for which Operator obtains or has obtained the Start Over and Look Back rights (*e.g.*, through an agreement with the Network).  In addition, Owner shall cause each Station to make available to Operator, at Operator's sole expense, for Start Over, Look Back and VOD any and all programming that Owner or such Station makes available either directly or through a third party on a VOD basis no later than the time it is delivered to the applicable other distributor and for the same duration as is made available to such other distributor.  Any and all such programming shall be deemed to be Programs hereunder.  Owner or each Station will provide to Operator, on a monthly basis and via a mutually agreed method, a schedule of Programs, along with a meta data file in an electronic format acceptable to Operator that identifies specified data for each Program, including the start time whereby recording of such Program shall commence and the end time whereby recording of such Program shall cease.  Operator shall have the right to advertise and promote by any means or media the exhibition of the Programs with Start Over/Look Back/VOD.

- 20 -

## EXHIBIT D

### Included LMAs

An "Included LMA" shall mean a full-power commercial television station that is entitled to mandatory carriage within its Television Market pursuant the FCC Rules, that has elected retransmission consent status for the then-current cycle, and that satisfies each of the following criteria:

1.     Nexstar has day-to-day managerial authority over such station except to the extent that the owner and licensee of such station is required by FCC Rules to maintain such authority, and Nexstar supervises and directs the employees of such station, except to the extent that the owner and licensee of such station is required by FCC Rules to supervise and direct such employees;

2.     Nexstar exercises the authority to compel the use of the assets of such station to comply with its obligations under this Agreement;

3.     Nexstar sets the station's advertising rates and oversees the sale of advertising time on the station;

4.     Nexstar has the right to program such station with respect to substantially all station programming and performs all programming functions for such station, including without limitation choice and acquisition of all syndicated programming to the extent permitted by FCC Rules;

5.     Nexstar negotiates, or oversees the negotiation of and approves, all applicable network affiliation agreement(s) for such station,

6.     If requested by Operator, such station delivers to Operator a certification executed by an officer of such station certifying that Nexstar has the exclusive legal authority to negotiate and enter into all retransmission consent agreements for such station;

7.     Nexstar has a substantial *bona fide* financial interest in such station (other than a bare holding of common stock), and such interest is directly correlated to the profits and losses of such station; and

8.     Nexstar and the FCC licensee of such station have mutually entered into a valid and binding LMA or agreement for the provision of management services by Nexstar that, if required by FCC Rules, is filed with the FCC.

9.     The economic consideration required hereunder shall not have constituted the sole material business reason for which such station enters into said agreement with Nexstar.

In addition to the foregoing, no station may be added to this Agreement as an Included LMA without Operator's prior written consent if such station is owned, as of the date of execution of this Agreement, by a Big Four Network (i.e., ABC, CBS, Fox or NBC O&Os).



# EXHIBIT 2



**BROADCASTING GROUP, INC.**

December 16, 2010

*Via Electronic Mail/Overnight Delivery*

Mr. Henry Pearl
Area Vice President of Operations
Time Warner Cable – Central New York
6005 Fair Lakes Road
East Syracuse, NY 13057

Re: Immediate Demand to Cease & Desist

Dear Mr. Pearl:

We are in receipt of your letters notifying Nexstar Broadcasting and Mission Broadcasting of Time Warner's intent to add carriage of WBRE-TV on its cable systems serving certain communities in Delaware, Otsego, Herkimer and Oneida Counties, New York, and to add carriage of WUTR to its cable systems serving communities in Essex, Franklin and Clinton Counties, New York. We have separately confirmed that you have already added such carriage notwithstanding your untimely and improper notice. **We hereby demand you that you immediately cease and desist all carriage of WBRE-TV in the referenced counties and, on behalf of Mission Broadcasting, demand that you immediately cease and desist all carriage of WUTR in the referenced counties.**

Your notification letter states that Time Warner is permitted to make these additions under our current retransmission consent agreement. You are mistaken. While the agreement permits Time Warner to cease carriage of signals it carries outside of the stations' Designated Market Areas, it nowhere permits Time Warner to add carriage of Nexstar's or Mission's stations to systems outside of their respective DMAs, let alone without our specific advance consent and authorization.

Your carriage of WBRE and WUTR on an unauthorized basis is a violation of the Communications Act, the Federal Communications Commission's rules and the copyright laws. Furthermore, Nexstar and Mission are not permitted by their respective network affiliation agreement to grant such carriage rights for stations that are not significantly viewed, or were not carried on the systems prior to 1993. Accordingly, your actions have cause Nexstar to breach its affiliation agreement with NBC with respect to WBRE and Mission to breach its affiliation agreement with ABC with respect to WUTR. Pursuant to Section 9(c) of our retransmission consent agreement we hereby notify you that you are obligated, and we will expect you, to indemnify and defend Nexstar and Mission from any and all losses and claims asserted by NBC and/or ABC as a result of Time Warner's unauthorized actions.

Mr. Henry Pearl
December 16, 2010
Page 2

Please confirm to me in writing, via electronic mail to ehammond@nexstar.tv, that you have ceased carriage of WBRE-TV on your cable systems serving Delaware, Otsego, Herkimer and Oneida Counties, New York, and ceased carriage of WUTR on your cable systems serving communities in Essex, Franklin and Clinton Counties, New York not later than 12:00 pm central time today (December 16). If you fail to cease such carriage, we will file for such relief with the FCC and in court as we deem appropriate.

Please do not hesitate to contact me with any questions.

Sincerely,

Elizabeth Hammond
Vice President & General Counsel

cc:    TW Executive Vice President & Chief Programming Officer (via overnight mail)
       Executive Vice President & General Counsel (via overnight mail)
       Jean Dietze, Sr Vice President – Affiliate Relations, NBC Universal
       John Rouse, Sr Vice President – Affiliate Relations, ABC Television Network
       Perry Sook
       Steve Merren
       Lou Abitabilo
       Dennis Thatcher



# EXHIBIT 3

60 Columbus Circle
New York, NY 10023
Tel 212-364-8480
Fax 704-973-6242
michelle.kim@twcable.com

*Michelle N. Kim*
*Group Vice President & Chief Counsel, Programming*



**TIME WARNER**
**C A B L E**

December 16, 2010

<u>Via Federal Express & Facsimile (972-373-8888)</u>

Elizabeth Hammond
Vice President & General Counsel
Nexstar Broadcasting Group, Inc.
5215 North O'Connor Blvd.
Suite 1400
Irving, TX 75039

Dear Ms. Hammond:

I am writing in response to your letter to Henry Pearl of this morning. Contrary to your assertion, Nexstar has, in its retransmission consent agreement with Time Warner Cable ("TWC"), granted TWC the right to retransmit WBRE and WUTR (the "Stations") in TWC owned or operated systems, without the geographic limitations you describe. Moreover, as I'm sure you are aware, any copyright licenses necessary for those systems' secondary transmission of the Stations' signals are provided under the compulsory copyright provisions set forth Section 111 of the Copyright Act.

In our retransmission consent agreement, Nexstar represented and warranted that it had all rights to grant the licenses granted therein, free and clear of any and all claims by any third party. We are therefore puzzled and troubled by your statement that you do not actually have those rights. If that is the case, we would expect to be indemnified for any claims that may be brought against us in connection with its carriage of the Stations.

If you have any further concerns, please do not hesitate to contact me. Also, this letter is not intended to be a full statement of the rights and remedies with regard to the matters discussed herein, all of which are expressly reserved.

Sincerely,

Michelle N. Kim

cc:     Marc Lawrence-Apfelbaum - Executive Vice President & General Counsel
        Melinda Witmer – EVP & Chief Programming Officer
        Perry Sook – Chief Executive Officer, Nexstar Broadcasting Group, Inc.
        Steve Merren – General Manager WUTR
        Lou Abitabilo – General Manager WBRE ✔
        Vice President and General Counsel, Nexstar Broadcasting Group, Inc.
        David M. Lange – Assistant Chief Counsel



# EXHIBIT 4



December 21, 2010

<u>*Via Electronic Mail and Overnight Delivery*</u>

Michelle N. Kim
Group Vice President & Chief Counsel, Programming
Time Warner Cable
60 Columbus Circle
New York, New York 10023

      Re:  Notice of Breach of Agreement

Dear Ms. Kim:

      On the evening of December 15, 2010, Henry Pearl, Area Vice President of TW Central New York, notified Nexstar and Mission, as applicable, that Time Warner has added WBRE-TV to its systems serving certain communities in Delaware, Otsego, Herkimer and Oneida Counties, New York (the "Utica System"), and added WUTR to its systems serving communities in Essex, Franklin and Clinton Counties, New York (the "Plattsburg System"). We continue to object to Time Warner's interpretation of the agreement as permitting Time Warner to carry any Nexstar, Mission or Four Points' station on any Time Warner system throughout the country. As the legislative history and relevant Federal Communications Commission Orders make clear, retransmission consent is inherently granted with respect to carriage of stations in their local markets, not in non-local markets in distant parts of the country. (Time Warner is equally aware that the networks grant authority for retransmission consent only within local markets and on a significantly viewed basis in their network affiliation agreements.) Therefore, it is absurd for Time Warner to suggest that the parties negotiated or even intended to negotiate for carriage rights covering all of Nexstar's, Mission's and Four Points' stations on every Time Warner system nationwide during the last retransmission consent negotiations. Indeed, had Nexstar suggested to Time Warner that the agreement was contingent on Time Warner' carriage of its station in Jacksonville, Florida on its New York City system at the time the agreement was executed, the agreement never would have been executed by Time Warner.

      We also bring to your attention that these additions are in clear violation of federal law. Pursuant to §76.1601 of the FCC's rules (47 C.F.R. §76.1601), a cable operator is required to provide written notice to a broadcast television station at least 30 days prior to either deleting from carriage or repositioning that station. As Time Warner itself has previously acknowledged, the addition of a station to a system requires this advance notice (see e.g., Time Warner's Request For Expedited Waiver Of Part 76 Cable System Channel Change And Repositioning Notification Procedures with respect to the addition of television station WBTW back to its systems serving various communities in South Carolina). Time Warner's notice of the addition of WBRE-TV on its Utica System and WUTR on its Plattsburg System was delivered a scant handful of hours prior to the addition, after business hours, and in a manner inconsistent with the retransmission consent agreement. (As of the date hereof, we have yet to be properly notified by



Michelle Kim
December 21, 2010
Page 2

Time Warner as required pursuant to the retransmission consent agreement.) We object to this lack of timely notice and will take all actions we deem necessary to protect our rights based on this lack of notice.

In addition, it is a well-established principle of contract law that parties to a contract are deemed to have contracted with reference to existing law, and that all applicable provisions of state and federal law existing at the time of the formation of a contract are regarded as a part of the contract as implied terms. Therefore, Time Warner's failure to comply with §76.1601, and correspondingly §76.1603 with respect to notification of its customers and local franchising authorities, prior to adding WBRE-TV to the Utica System, and adding WUTR to the Plattsburg System, constitutes a material breach of the retransmission consent agreement between Time Warner, Nexstar Broadcasting, Mission Broadcasting and Four Points Media Group.

Pursuant to Section 11(a) of the retransmission consent agreement, you are hereby notified that you have thirty (30) days to cure this breach. We will consider Time Warner to have cured the breach only by its immediate removal of WBRE-TV from the Utica System and by its immediate removal of WUTR from the Plattsburg System until such time as Time Warner provides us with 30 days advance notice (after the removal of unlawful carriage) of its intent to add these stations to its systems and confirms that it has provided its customers and franchising authorities with their requisite 30 day notices. (We are not waiving our continued and ongoing objection to Time Warner's interpretation of the agreement as permitting this carriage should Time Warner cure the breach.) If Time Warner does not cure this breach as required by the agreement, the agreement will terminate only with respect to Time Warner's rights (if any) to carriage of WBRE-TV on the Utica System and carriage of WUTR on the Plattsburg System on January 22, but any such termination will have no effect on the broadcasters' rights to indemnification for the damages caused by Time Warner's conduct.

We further clarify that this is a unilateral action taken by Time Warner in breach of the retransmission consent agreement and federal law. Accordingly, Nexstar and Mission have no obligation to provide Time Warner with a good quality signal as required by Section 3, nor do Nexstar and Mission have any copyright obligations to Time Warner with respect to its recently commenced carriage of WBRE-TV on the Utica System and WUTR on the Plattsburg System.

We look forward to your prompt response confirming that Time Warner come into compliance with applicable law and the agreement promptly. This letter is written without waiver of any broadcaster's rights to seek legal or equitable remedies in connection with the practices described above, all of which are expressly reserved.

Sincerely,

Elizabeth Hammond
Vice President & General Counsel

Michelle Kim
December 21, 2010
Page 3


cc:   Mark Lawrence, EVP & General Counsel
      Melinda Witmer, EVP & Chief Programming Officer
      David M. Lange, Assistant Chief Counsel
      Perry Sook
      Jean Dietze, Sr Vice President – Affiliate Relations, NBC Universal
      John Rouse, Sr Vice President – Affiliate Relations, ABC Television Network



# EXHIBIT 5

DEC-22-2010  18:55     TWC PROGRAMMING                    2123648541     P.02

60 Columbus Circle
New York, NY 10023
Tel 212-364-8480
Fax 704-973-6242
michelle.kim@twcable.com

Michelle N. Kim
Group Vice President & Chief Counsel, Programming



# TIME WARNER
## C A B L E

December 22, 2010

<u>Via Federal Express & Facsimile (972-373-8888)</u>

Elizabeth Hammond
Vice President & General Counsel
Nexstar Broadcasting Group, Inc.
5215 North O'Connor Blvd.
Suite 1400
Irving, TX 75039

Dear Ms. Hammond:

This letter responds to your December 21 notice asserting that Time Warner Cable ("TWC") is in breach of its retransmission consent agreement with Nexstar ("Agreement"). In that notice, you expressly invoke the thirty (30) day cure provision found in Section 11(a) of the Agreement. Although we continue to evaluate Nexstar's position, I thought it would be useful to provide you with our initial reaction to your letter.

Nexstar's position is that TWC may not carry WBRE and WUTR outside those stations' designated market areas. As we explained in our letter of December 16, however, the language of Section 1 of the Agreement provides TWC the right to retransmit the stations on *each* "System" and defines "System" as "*any*" TWC owned or operated cable system. Nowhere does the Agreement impose any geographic limitations on TWC's carriage rights with regard to the covered stations. It is well established that where, as here, the language of the contract is clear, that language must govern the contract's interpretation. Because the Agreement plainly grants TWC the right to retransmit WBRE and WUTR on *any* of its systems, it is not clear to us how TWC's exercise of that right could cause a breach.

We also fail to understand your position that retransmission consent is "inherently granted with respect to carriage of stations in their local markets." Many retransmission consent agreements—like the one at issue—are not so limited, and the FCC has expressly acknowledged parties' right to enter into such arrangements. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Broadcast Signal Carriage Issues*, Report and Order, 8 FCC Rcd 2965 ¶ 148 (1993) (explaining that "all television stations, local and distant alike, have retransmission consent rights," and categorically rejecting the notion that "broadcasters do not have that right with respect to cable systems outside the market"); *id.* ¶ 174 (emphasizing that the language of "particular contracts," rather than the statute, will determine the scope of a broadcaster's grant of retransmission consent). Indeed, if retransmission consent agreements *never* provided for out-of-market carriage and networks invariably prohibited such grants in affiliation agreements, then there would be no need for the FCC's non-duplication rules or, for that matter, the distant signal importation provisions of Section 111 of the Copyright Act. Moreover,

Nexstar's assertion that TWC would not have agreed to an *obligation* to carry these stations out of market is beside the point. As we have previously explained, Section 1 of the Agreement grants TWC broad carriage rights, but an entirely separate provision determines TWC's carriage obligations, and those are far more limited.

With respect to Nexstar's arguments about TWC's notice obligations, we are aware of nothing in the FCC's rules that would require 30 days' advance notice to Nexstar or to any other party in these circumstances. Nor is it clear how any such regulatory requirement would bear on our compliance with the Agreement in any case. Your assertion that Section 76.1601 of the FCC's rules required written notice to Nexstar at least 30 days in advance of our carriage of WBRE-TV and WUTR in additional communities seems to misapprehend the text of the rule. That provision applies only where a cable operator "delet[es]" or "reposition[s]" a station, 47 C.F.R. § 76.1601, neither of which has occurred here. Nor has TWC "acknowledged" that Section 76.1601 or 76.1603 applies more broadly, as you assert. TWC filed the waiver request you cite because its restoration of a broadcast signal that had been temporarily dropped entailed repositioning the Home Shopping Network. That proceeding accordingly has no relevance here, where TWC's carriage of the Nexstar stations out of market required neither the deletion nor repositioning of any programming service. Indeed, in the Media Bureau order granting TWC's request, the Bureau described "the underlying purpose of the applicable rules" in relevant part as alerting "broadcast television stations *that will be deleted or repositioned* to changes in programming services prior to implementation of such changes." *Media General Communications Holdings,* Memorandum Opinion and Order, 24 FCC Rcd 11509 ¶ 7 (MB 2009) (emphasis added).

In light of the foregoing, we believe that Nexstar may not terminate the Agreement and must live up to the signal quality, copyright, and all other obligations contained therein. We will, however, take under advisement your demand for cure within 30 days and will remain available to further discuss these matters with you at your convenience.

Sincerely,

Michelle N. Kim

cc:   Marc Lawrence-Apfelbaum – Executive Vice President & General Counsel
      Melinda Witmer – EVP & Chief Programming Officer
      Perry Sook – Chief Executive Officer, Nexstar Broadcasting Group, Inc.
      Steve Merren – General Manager WUTR
      Lou Abitabilo – General Manager WBRE
      David M. Lange – Assistant Chief Counsel
      Susan Weinstein – Vice President, Programming



# EXHIBIT 6



NBC UNIVERSAL

JODI BRENNER
Senior Vice President
Business & Legal Affairs
NBC Universal Networks Distribution

900 Sylvan Avenue
Englewood Cliffs, NJ 07632
tel 201 735 4773
fax 201 735 3595
jodi.brenner@nbcuni.com

December 31, 2010

<u>Via Facsimile 704-973-6346 and Overnight Mail</u>

Ms. Melinda Witmer
EVP and Chief Programming Officer
Time Warner Cable, Inc.
60 Columbus Circle
16th Floor
New York, NY 10023

Re: The Retransmission by Time Warner Cable of the WBRE Broadcast Signal in the
Utica, NY DMA

Dear Melinda;

We had hoped that the situation in Utica, NY would have been resolved by now.
However, as it has not, and as Time Warner Cable ("TWC") continues to retransmit the
broadcast signal of WBRE in the Utica, NY DMA, the NBC Television Network hereby
puts Time Warner Cable on notice that NBC has not granted WBRE the right to transmit
or otherwise permit the retransmission of NBC Network programming beyond the
station's licensed DMA.

The relevant provision of the NBC Affiliation Agreement with WBRE provides in part that
the "Station shall not grant consent to the retransmission of its broadcast signal by any
cable television system, or . . . to any other MVPD whose carriage of broadcast signals
requires retransmission consent, if such cable system or MVPD is located outside the
DMA to which Station is assigned, unless Station's signal was actually carried by such
cable system or MVPD as of April 1, 1993, or, with respect to such cable system, is
"significantly viewed" (as determined by the FCC) as of April 1, 1993.

NBC has notified WBRE that if it granted TWC the right to retransmit the NBC Network
programming contained in the Station's broadcast signal outside of the Station's DMA,
whether knowingly or unknowingly, then it is in breach of the Station's affiliation
agreement.  Accordingly, the continued retransmission by TWC of the NBC Network
programming contained in the WBRE signal outside of WBRE's licensed DMA is without
right or authority.

Ms. Melinda Witmer
December 31, 2010
Page 2

Please be advised that NBC reserves all rights and remedies it may have against Time Warner Cable under law or at equity.

Very truly yours,

Jodi Brenner
Senior Vice President, Business & Legal Affairs

Cc:    Robert D. Marcus, TWC
        Marc Lawrence-Apfelbaum, Esq., TWC
        Michelle Kim, Esq., TWC
        Perry Sook, Nexstar
        Vic Vetters, Smith Media
        Jean-Briac Perrette
        Bridget Baker
        Jean Dietze
        Rhonda Brockmann, Esq.



# EXHIBIT 7

2010  30 04:23 PM DISNEY 818-560-5682                                                              1/3

# The Walt Disney Company - LEGAL - Fax Cover Sheet

**Date:** December 30, 2010

**To:** Diane Siembab
Station Manager

**From:** Larissa Alarcon

*Office of*
*John L. Rouse*
*Senior Vice President*
*Affiliate Relations and Marketing*

**Phone:**

**Phone:** (818) 460-7750

**Fax:** (315) 738-9891

**Fax:** (818) 460-5682

**Subject:** See attached letter.

**Pages (including cover):** 3

☒ *Urgent*   ☒ *For your review*   ☐ *Reply ASAP*   ☐ *Hard copy to follow*

## URGENT MATERIAL ATTACHED

*PRIVILEGED & CONFIDENTIAL*

This fax transmittal is intended for the use of the individual or entity to which it is addressed, and may contain
information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us immediately
by telephone and return the original message. Thank you.



John L. Rouse
Senior Vice President
Affiliate Relations and Marketing

<u>VIA FACSIMILE</u>

December 30, 2010

Dennis P. Thatcher                          Perry Sook
Executive Vice President & COO              Chairman, President & Chief Executive Officer
Mission Broadcasting, Inc.                  Nexstar Broadcasting Group, Inc.
7650 Chippewa Road, Suite 305              5215 North O'Connor Boulevard, Suite 1400
Brecksville, OH 44141-2319                  Irving, TX 75039
F: (877) 268-6040                          F: (972) 373-8888
   (440) 546-1903

Dear Sirs:

We understand that Time Warner Cable ("TWC") has imported the signal of Mission Broadcasting, Inc.'s
("Mission") station WUTR to TWC systems serving communities in Essex, Franklin, and Clinton counties,
New York and may import the signal of that and/or other of your stations into other markets outside
your stations' respective DMAs and the areas in which your stations are significantly viewed.
Accordingly, if, as TWC must contend, you have granted retransmission consent to TWC outside these
areas, in whole or in part, then you are in breach of our May 20, 2005 Primary Television Affiliation
Agreements (as amended) (the "Agreements"):

> With respect to the existing Network analog service and the Primary Digital Feed, you are
> authorized to grant retransmission consent, pursuant to FCC Rule 76, to cable systems (and
> other MVPD's) located within your DMA and areas where your station is "significantly viewed"
> as defined by FCC Rule 76. (See, e.g., May 20, 2005 Primary Television Affiliation Agreement
> with Mission, Section III.B.)

Accordingly, reserving and without waiving all rights and remedies we may have, we hereby demand
that you take all actions necessary to ensure that TWC does not continue or initiate the retransmission
of the signals of your ABC-affiliated stations in any areas outside the areas authorized by our
Agreements.

500 South Buena Vista Street, Burbank, CA 91521-4408
Phone: (818) 460-7550   Fax (818) 460-5234
E-mail: john.l.rouse@abc.com

In addition, as you know, American Broadcasting Companies, Inc. or its affiliated companies are the copyright owners of significant programming broadcast by your ABC-affiliated stations. We expressly reserve our rights to seek any and all relief for the direct and/or indirect infringement of those rights, including statutory damages, against anyone who retransmits to the public, or authorizes the retransmission of such programming to the public, without authorization to do so.

Very truly yours,

John L. Rouse

Cc:    Elizabeth Hammond
       Diane Siembab

500 South Buena Vista Street, Burbank, CA 91521-4408
Phone: (818) 460-7550   Fax (818) 460-5234
E-mail: john.l.rouse@abc.com



# EXHIBIT 8

# CONSTANTINE | CANNON

**Lloyd Constantine**
**Matthew L. Cantor**
Attorneys at Law
212-350-2700
lconstantine@constantinecannon.com
mcantor@constantinecannon.com

NEW YORK | WASHINGTON

January 28, 2011

<u>**VIA EMAIL AND OVERNIGHT DELIVERY**</u>

Michelle N. Kim, Esq.
Group Vice-President &
   Chief Counsel, Programming
Time Warner Cable
60 Columbus Circle
New York, New York 10023

Re:   *Unauthorized Retransmission By Time Warner Cable ("TWC") of*
      *Broadcast Signals Of Stations' Owned And/Or Operated By Nexstar*
      *Broadcasting, Inc. ("Nexstar")*

Dear Ms. Kim:

We have been retained by Nexstar to prevent the unauthorized use of the broadcast signals of stations covered by a Retransmission Consent Agreement ("Covered Stations") entered into by TWC, Nexstar, Mission Broadcasting, Inc. ("Mission") and Four Points Media Group Holding LLC ("Four Points") (the "RCA"). Nexstar retained us as a result of TWC's recent unauthorized, out of market retransmission of the signals of two Covered Stations. This distant retransmission of Covered Stations' signals constitutes unlawful conversion and infringement of their intellectual property and a breach of the RCA under its clear terms.

Nonetheless, as described more fully below, TWC has refused to acknowledge the illegality of its actions, claiming that they are permitted by the RCA. TWC's erroneous position raises concerns that TWC will continue to misappropriate the property of Covered Stations. Accordingly, we hereby demand that TWC affirm by February 11, 2011 that TWC will not again engage in the distant retransmission of signals broadcast by Covered Stations.

I.   *Background Facts*

The RCA became effective on June 30, 2009 and has a term of five years. RCA § 4. Under the RCA, "each Upgraded System" that is owned by TWC *"that is located in the Television Market . . . of a [Covered] Station . . . shall retransmit"* that Covered Station's signal. RCA § 2(a) (emphasis supplied). Attachment A of the RCA identifies the specific "Markets" in which specific Covered Stations will have their signals retransmitted by TWC systems.

187187.1

# CONSTANTINE | CANNON

Michelle N. Kim, Esq.
January 28, 2011
Page 2

As set forth in Attachment A, WBRE -- an affiliate of the NBC network -- is a Covered Station located in the Wilkes-Barre, Pennsylvania designated market area ("DMA"). It is owned and operated by Nexstar. Between December 16, 2010 (if not before) and January 9, 2011, TWC, without Nexstar's authorization, retransmitted WBRE's signal outside of the Wilkes-Barre DMA and throughout the Utica, New York DMA. Nexstar was not compensated for the unauthorized use of WBRE's signal.

Also, as set forth in Attachment A, WUTR -- an affiliate of the ABC network -- is a Covered Station located in the Utica DMA. It is owned by Mission for whom Nexstar provides certain services for the station. During the time that TWC was retransmitting WBRE's signal out of market without permission, TWC was also retransmitting the signal of WUTR outside its DMA, again without any authorization to do so. Specifically, during that time, TWC retransmitted WUTR's signal outside the Utica DMA and throughout the Burlington, Vermont/Plattsburgh, New York DMA. TWC did not compensate either Nexstar or Mission for this unauthorized use of WUTR's signal.

Per the letters of Elizabeth (Hammond) Ryder, Esq. dated December 16, 2010 and December 21, 2010, TWC was notified that its conduct was in breach of the RCA. Regardless, TWC continued to engage in the unauthorized use of the Covered Stations' signals.[1] While retransmitting WBRE and WUTR out of their DMAs, TWC, via your letter dated December 22, 2010, asserted that it was not in breach of the RCA.

II.     *TWC Distant Retransmission Of The Signals Of WBRE and WUTR Was Unlawful*

TWC's unauthorized use of WBRE and WUTR signals was illegal, amounting to conversion, copyright infringement and breach of contract. TWC's claim that the RCA permits it to engage in distant retransmission of the signals of Covered Stations, including the signals of WBRE and WUTR, is meritless as it is (1) contrary to the clear wording of the RCA, (2) inconsistent with TWC's historic performance under the RCA, and (3) non-sensical.

*First*, TWC's claim that "[n]owhere does the [RCA] impose any geographic limitations" upon TWC's use of Covered Stations' signals is belied by the plain meaning of the RCA. It demonstrates that TWC was not provided with consent to retransmit the signals of Covered

---

[1]     TWC retransmitted the signals of WBRE and WUTR out of market because it had lost retransmission consent rights from the NBC network affiliate in Utica (owned by Smith Media License Holdings, LLC) and the ABC network affiliate in Burlington/Plattsburgh (owned by Lambert Broadcasting of Burlington, LLC). Eventually, after reaching retransmission consent agreements with Smith and Lambert, TWC ceased retransmitting the signals of WBRE and WUTR outside of their DMAs.

187187.1

## CONSTANTINE | CANNON

Michelle N. Kim, Esq.
January 28, 2011
Page 3

Stations outside of their DMAs. As set forth above, Section 2(a) specifically provides that only TWC systems that are *"located in the Television Market"* of a Covered Station "shall retransmit" the signals of those stations. (Emphasis supplied).[2] No TWC systems other than those "located in a Television Market" of a Covered Station are given any authorization under the RCA to retransmit the signals of Covered Stations. *See also* RCA § 7 ("Except as specifically permitted herein . . . no [TWC] System shall . . . retransmit . . . any portion of the Stations' Signals without Owner's prior written consent . . .") Moreover, Exhibit A of the RCA confirms the parties' agreement over the specific DMA in which a particular Covered Station's signals would be transmitted. It shows that the RCA only provides for WBRE's signal to be retransmitted by TWC systems in the Wilkes-Barre DMA and for WUTR's signal to be retransmitted by TWC systems in the Utica DMA.

*Second,* TWC's actual course of conduct, while the RCA has been in effect, betrays TWC's interpretation of the RCA. For the overwhelming amount of time that the RCA has been effective, TWC has refrained from retransmitting the signals of Covered Stations outside of their DMAs. And, following (1) the filing of Nexstar's December 28, 2010 petition to the FCC seeking an injunction precluding TWC from continuing to retransmit WBRE and WUTR out of market and (2) TWC's securing of retransmission rights for the local NBC network affiliate in Utica and local ABC network affiliate in Burlington/Plattsburgh, TWC ceased retransmitting any Covered Stations out of market. As the RCA's terms must be interpreted through the prism of the parties' historic performance under well-established precedent, TWC's position fails as a matter of law.

*Third,* TWC's apparent reading of the RCA is non-sensical, rendering its interpretation of the RCA a legal nullity. TWC asserts that the RCA permits it to retransmit the signals of any Covered Station to any TWC system regardless of the system's location, without compensating the owners of Covered Stations for such distant retransmission. Certainly, to date, TWC has not paid Nexstar or Mission for the distant retransmission of WBRE and WUTR. Rather, TWC has limited its per subscriber payment to Nexstar and Mission based upon the number of TWC subscribers located in the DMAs of Covered Stations. Neither Nexstar, Mission nor Four Points agreed to TWC's "free" access to these signals. And, as they are economically rational actors, none of them would have done so.

---

[2]      Other sections of the RCA also demonstrate that the license granted to TWC thereunder is subject to geographic limitations. *See* RCA § 2(b) ("In each [TWC] System . . . *located within a Station's Television Market*, [TWC] will downconvert to an analog format the Primary Program Transport Stream of the Signal of each Station . . ."); § 2(c) (. . . each applicable Upgraded [TWC] System *within a Station's Television Market* shall retransmit in HDTV format the applicable Station's Primary Transport Stream . . .") (emphasis supplied).

# CONSTANTINE | CANNON

NEW YORK | WASHINGTON

Michelle N. Kim, Esq.
January 28, 2011
Page 4

Further, TWC appears to believe that the RCA provides it with distant retransmission rights, despite that none of Nexstar, Mission or Four Points have had the capacity to provide them with such retransmission rights. As TWC is well aware, those rights are constrained by the territorial limitations set forth in the affiliation agreements that Nexstar, Mission and Four Points have with the Big Four networks. It is for this reason that Ms. Hammond Ryder, in the letters referenced above, invoked the provisions of the RCA that require TWC to indemnify the other parties of the RCA should any of the Big Four networks seek damages from them for TWC's unauthorized use of their signals. RCA § 9(c).

III.     *Conclusion*

In light of TWC's stated position and prior course of conduct, Nexstar hereby demands that TWC affirm that it will not again retransmit the signal of any Covered Station outside of its DMA. Please provide us with such an affirmation by February 11, 2011.

Please be advised that Nexstar retains all of its rights to seek remedies for TWC's unauthorized use of the signals of Covered Stations, including but not limited to:

(1) a declaration of the rights of Nexstar, Mission and Four Points under the RCA;

(2) an injunction precluding TWC from engaging in future distant signal retransmission of Covered Stations without the consent of Nexstar, Mission and/or Four Points;

(3) compensation (including compensation for copyright infringement) for TWC's misappropriation of Covered Stations signals; and

(4) all damages, consequential or otherwise, incurred and/or to be incurred as a result of TWC's illegal conduct.

Yours very truly,

Lloyd Constantine /MLC

Lloyd Constantine

Matthew L. Cantor

cc:     Elizabeth (Hammond) Ryder, Esq.

187187.1



# EXHIBIT 9

# CAHILL GORDON & REINDEL LLP
## EIGHTY PINE STREET
### NEW YORK, NY 10005-1702

FLOYD ABRAMS
L. HOWARD ADAMS
ROBERT A. ALESSI
HELENE R. BANKS
LANDIS C. BEST
SUSAN BUCKLEY
KEVIN J. BURKE
JAMES J. CLARK
BENJAMIN J. COHEN
CHRISTOPHER T. COX
STUART G. DOWNING
ADAM M. DWORKIN
RICHARD E. FARLEY
PATRICIA FARREN
JOAN MURTAGH FRANKEL
JONATHAN J. FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI

WILLIAM B. GANNETT
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
CRAIG M. HOROWITZ
DOUGLAS S. HOROWITZ
DAVID G. JANUSZEWSKI
ELAI KATZ
THOMAS J. KAVALER
DAVID N. KELLEY
CHÉRIE R. KISER*
EDWARD P. KRUGMAN
JOEL KURTZBERG
ALIZA R. LEVINE
JOEL H. LEVITIN
GEOFFREY E. LIEBMANN
MICHAEL MACRIS

TELEPHONE: (212) 701-3000
FACSIMILE: (212) 269-5420

————

1990 K STREET, N.W.
WASHINGTON, DC 20006-1181
(202) 862-8900
FAX: (202) 862-8958

————

AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON, ENGLAND EC2N 2HA
(011) 44.20.7920.9800
FAX: (011) 44.20.7920.9825

————

WRITER'S DIRECT NUMBER

(212) 701-3230

ANN S. MAKICH
JONATHAN I. MARK
BRIAN T. MARKLEY
GERARD M. MEISTRELL
MICHAEL E. MICHETTI
WILLIAM J. MILLER
ATHY A. MOBILIA
NOAH B. NEWITZ
MICHAEL J. OHLER
KENNETH W. ORCE
DAVID R. OWEN
JOHN PAPACHRISTOS
LUIS R. PENALVER
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
TAMMY L. ROY
JONATHAN A. SCHAFFZIN

JOHN SCHUSTER
MICHAEL A. SHERMAN
DARREN SILVER
HOWARD G. SLOANE
SUSANNA M. SUH
JONATHAN D. THIER
JOHN A. TRIPODORO
GLENN J. WALDRIP, JR.
MICHAEL B. WEISS
S. PENNY WINDLE
COREY WRIGHT
DANIEL J. ZUBKOFF
ADAM ZUROFSKY

————

*ADMITTED IN DC ONLY

February 11, 2011

Re:    Retransmission Consent Granted to Time Warner Cable, Inc.
       ("TWC") By Nexstar Broadcasting, Inc. ("Nexstar")

Dear Mr. Constantine:

       I write in response to your January 28, 2011 letter, in which you demand that TWC forego its right to retransmit Nexstar stations in any TWC system. You assert that retransmission by TWC of any Nexstar station outside its designated television market would constitute a breach of the retransmission consent agreement between the parties (the "RCA"), and would therefore also amount to conversion and copyright infringement. Rather than address every contention in your letter, this response focuses on the central contractual issue.

       Put simply, none of Nexstar's purported legal claims have merit because the RCA unequivocally grants TWC consent to retransmit Nexstar stations outside of their designated markets. Specifically, section 1 of the RCA – "Retransmission Consent" – grants TWC the right to retransmit the stations on *each* "System" and defines "System" as "*any*" TWC owned or operated cable system, without geographical limitation. Your failure to address the provision of the RCA in which Nexstar actually grants retransmission consent renders your claims baseless.

       In supposed support of Nexstar's restrictive interpretation, you rely on sections 2, 4 and 7 of the RCA. Those sections address certain carriage *obligations* with respect to the stations' designated market areas, but nothing therein purports to limit TWC's *right* to retransmit Nexstar stations.[1]

---

[1]    As your January 28 letter notes repeatedly, sections 2, 4, and 7 of the RCA provide conditions under which TWC "shall" retransmit the stations' signals, with no limitation on where TWC "may" retransmit them.

-2-

Moreover, the sections you cite demonstrate that when the parties intended for a provision to be geographically limited, they said so expressly, precluding any argument that such a geographical limitation should be implied with respect to the broad grant of retransmission consent in section 1 of the RCA.

Nexstar's arguments also are inconsistent with the surrounding provisions of the RCA, which demonstrate that the retransmission consent was clearly understood to include systems outside stations' designated markets. This is confirmed by section 11(b), which provides that: "[TWC] may discontinue carriage of any Program Transport Stream of any Station if: . . . (iii) the System carrying such Program Transport Stream is located outside such Station's Television Market." That provision would be rendered entirely superfluous if, as Nexstar now asserts, systems outside a station's market were not permitted to carry its signal in the first place.

In light of the RCA's unambiguous grant of retransmission consent without geographical limitation, and the express contemplation of carriage "outside such Station's Television Market," we disagree that distant retransmission constitutes a breach of the RCA. As we understand your letter, the asserted claims for conversion and copyright infringement are also premised on the theory that the RCA does not provide consent for distant retransmission, and therefore they fail for the same reasons.

TWC also disagrees with your assertions that an alternative reading of the RCA is supported by TWC's course of conduct, or that the rights Nexstar granted to TWC render the RCA nonsensical. TWC does not always have occasion to retransmit Nexstar stations outside their respective markets, but that in no way undermines TWC's right to do so. TWC's limited distant retransmission of WBRE and WUTR is consistent with the distinction between TWC's broader carriage rights and its narrower carriage obligations, and is also consistent with TWC's discretion to discontinue carriage of stations outside their designated markets, as provided for in section 11(b).

Your assertion that Nexstar does not have the capacity to grant consent for distant retransmission runs directly counter to its representations and warranties in the RCA. TWC relied on those representations and warranties, which was entirely reasonable in light of the FCC's express recognition of parties' right to enter into such arrangements. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Broadcast Signal Carriage Issues*, Report and Order, 8 FCC Rcd 2965 ¶ 148 (1993) (explaining that "all television stations, local and distant alike, have retransmission consent rights," and categorically rejecting the notion that "broadcasters do not have that right with respect to cable systems outside the market"); *id* ¶ 174 (emphasizing that the language of "particular contracts," rather than the statute, will determine the scope of a broadcaster's grant of retransmission consent).

Last, TWC is not obligated to pay Nexstar a separate fee for distant retransmission. Appendix B of the RCA provides that fees for the entire package of rights provided for in the RCA are calculated by reference to the number of "System subscriber[s] located in the Television Market of a Station." The RCA does not impose additional costs for additional uses of the stations' signals,

CAHILL GORDON & REINDEL LLP

-3-

whether by distant retransmission or otherwise.  As you know, under the governing statutory scheme TWC also makes compulsory license payments for distant signal retransmission, separate from any direct payments to the station owner.  This arrangement does not render the RCA nonsensical.

For all the foregoing reasons, TWC does not agree with Nexstar's assertion that distant retransmission of Nexstar stations would constitute a breach of the RCA, conversion, copyright infringement, or otherwise entitle Nexstar to any form of relief.

Sincerely,

Brian Markley

Lloyd Constantine, Esq.
Constantine Cannon LLP
335 Madison Avenue, 9th Floor
New York, NY 10017

VIA FEDEX

cc:    Michelle Kim, Esq.



# EXHIBIT 10

July 12, 2012

Ms. Melinda Witmer
Executive Vice President & Chief Programming Officer
Time Warner Cable, Inc.
60 Columbus Circle
New York, NY  10023                                          **NBCUniversal**

Re:  Retransmission of Nexstar Stations' Signals

Dear Ms. Witmer,

I am writing to object to Time Warner Cable, Inc.'s ("Time Warner") retransmission of the signals of
broadcast television stations that are licensed to Nexstar Broadcasting, Inc. ("Nexstar") and affiliated with
the NBC Television Network ("NBC") in communities that are outside such stations' Television Markets (as
defined by the FCC) and where the stations are not significantly viewed.

Nexstar's affiliation agreement with NBC provides that, with certain exceptions not applicable here,
Nexstar will not grant consent to retransmission of a station's signal outside of the DMA to which the
station is assigned.  Nexstar has assured NBC that it is in compliance with its affiliation agreement, and
that Time Warner's retransmission of any Nexstar station outside such station's Television Market is
without Nexstar's consent.   Furthermore, Time Warner is well aware, based on prior notice from NBC, that
Nexstar cannot grant retransmission consent outside the appropriate Television Market.

Time Warner's secondary transmission of NBC's copyrighted programing contained within the Stations'
signals without a valid grant of consent is unauthorized, unlawful, not subject to statutory licensing and in
violation of NBC's rights.

This is not the first time that Time Warner has been put on notice transmission of NBC programming
outside the Nexstar stations' markets is not authorized.  NBC notified Time Warner on December 31, 2010,
in response to  an attempt by Time Warner at that time to illegally import NBC programming into a DMA
where Time Warner had failed to obtain the local NBC station's consent, that Nexstar cannot grant
retransmission consent outside its stations' markets.  Time Warner cannot assert that it is unaware that its
retransmission is without Nexstar's or NBC's consent.

NBC hereby demands that Time Warner immediately cease and desist all secondary transmission of NBC
programming in Nexstar station signals outside of such stations' DMAs or communities where the stations
were significantly viewed as of April 1, 1993.

This letter is without prejudice to any of NBC's rights and remedies at law or in equity, all of which are
expressly reserved.

Sincerely,

Rhonda Brockmann
VP, Business & Legal Affairs

Cc: Perry Sook, Nexstar Broadcasting
    Elizabeth Ryder, Nexstar Broadcasting
    Marc Lawrence-Apfelbaum, Time Warner Cable



# EXHIBIT 11

# ☿ DowLohnes

Jonathan Dunn

D 202.776.2642  E jdunn@dowlohnes.com

July 12, 2012

**VIA UPS OVERNIGHT and EMAIL (eryder@nexstar.tv)**

Ms. Elizabeth Ryder
Vice President & General Counsel
Nexstar Broadcasting Group, Inc.
5215 North O'Connor Blvd.
Suite 1400
Irving, Texas 75039

Re:   **Infringement of EYEWITNESS NEWS, EYEWITNESS NEWS
DAYBREAK, EYEWITNESS NEWS AT 5 and EYEWITNESS
NEWS AT 11 Service Marks**

Dear Ms. Ryder:

This law firm represents WFTV, Inc. ("WFTV"), a subsidiary of Cox Enterprises, Inc. It
has come to our client's attention that WBRE has reportedly authorized the retransmission of its
broadcast signal in the Orlando, Florida market, and therefore is using or authorizing the use of
the marks EYEWITNESS NEWS, EYEWITNESS NEWS DAYBREAK, EYEWITNESS
NEWS AT 5 and EYEWITNESS NEWS AT 11 in the Orlando market. For the reasons stated
below, your station's unauthorized use and licensing of these marks in the Orlando market
constitutes trademark infringement, and violates federal and state laws prohibiting unfair
competition.

Since at least as early as 1972, WFTV has used the service mark EYEWITNESS NEWS,
since at least as early as the early 1970s, WFTV has used the service mark EYEWITNESS
NEWS AT 11, since at least as early as 1976, WFTV has used the service mark EYEWITNESS
NEWS DAYBREAK, and since at least as early as the late 1970s, WFTV has used the service
mark EYEWITNESS NEWS AT 5 (collectively, the "WFTV Marks") in connection with
television broadcasting services and providing local news programming in the central Florida
market. WFTV has developed extremely valuable goodwill and an outstanding reputation in the
WFTV Marks and the viewing public in central Florida has come to associate the WFTV Marks
exclusively with WFTV.

WBRE's unauthorized use and license of the WFTV Marks in the Orlando market in
connection with television broadcasting services and news programming is likely to cause
consumer confusion in that consumers will be led to believe that WBRE's broadcast is associated
with or is being offered, marketed or endorsed by WFTV. Confusion is likely because WBRE's

**Dow Lohnes PLLC**
Attorneys at Law
www.dowlohnes.com

WASHINGTON, DC   ATLANTA, GA

1200 New Hampshire Avenue, NW, Suite 800
Washington, DC 20036-6802
T 202.776.2000  F 202.776.2222

Ms. Elizabeth Ryder
July 12, 2012
Page 2

marks and services are identical to the WFTV Marks and services. Any such use of the WFTV Marks by WBRE in central Florida injures the image of WFTV and the valuable goodwill associated with the WFTV Marks. For these reasons, any use by your station in the Orlando market of the WFTV Marks or any confusingly similar mark, constitutes trademark infringement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and state law and common law, which entitles WFTV to monetary, injunctive and other legal remedies.

Moreover, your authorization of the retransmission of "The Dr. Oz Show" and other syndicated programming in the Orlando market where WFTV has exclusive rights to this syndicated programming significantly undermines the benefits of the bargain WFTV had struck in its agreements with syndicators and therefore likely constitutes tortious interference with contract under state law. Of course, WFTV has no objection to the transmission of these syndicated programs in areas outside the Orlando market.

Accordingly, on behalf of WFTV, we must demand that Nexstar Broadcasting Group, Inc. ("Nexstar") immediately cease and desist all use and license of WFTV Marks, and any other mark that is similar to the WFTV Marks, in the Orlando market. Please note, WFTV takes no issue with WBRE's use of these marks in connection with television broadcasting services and news programming aired exclusively in the Wilkes-Barre, Pennsylvania market, but the use of these marks in the Orlando market severely damages the substantial goodwill WFTV has developed in the WFTV Marks.

Because of the urgency of this matter, and in light of the irreparable injury being caused to our client, we must ask that you provide us with written assurances within **forty-eight (48) hours** that Nexstar will comply with these demands. We hope that this matter can be resolved amicably, but if we do not receive a satisfactory response, our client will take whatever steps it deems necessary to protect its rights. This letter is without prejudice to our client's rights, all of which are expressly reserved.

Thank you in advance for your immediate attention to this matter. I look forward to hearing from you.

Sincerely,

Jonathan H. Dunn

Jonathan H. Dunn

cc:    Bob Bee, General Manager, WBRE



# EXHIBIT 12

**news-record.com**

# Cable spat continues, resolution uncertain

- Article
- Comments (12)

Saturday, July 14, 2012
(Updated 6:37 am)
Copyright 2012 News &amp; Record. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

By **MIKE KERNELS**
*Staff Writer*

| Recommend | Send |   28 people recommend this.

WINSTON-SALEM — Your top-ranked TV station has just been yanked off cable because of a contract dispute, cutting your audience in half. Viewers are calling. Advertisers want answers. Negotiations are at an impasse and don't seem to be improving. So, what's the next step?

• • •

If you're WXII (NBC, Channel 12), you go on. Like nothing has happened with Time Warner Cable. At issue: money. Same as it always is between cable providers and broadcasters. The three-year deal between Time Warner Cable and Hearst Television, which owns WXII, is over. Now, the sides can't agree on how much it's worth to carry WXII, whose broadcast area covers 17 counties and parts of Virginia. Time Warner Cable claims that Hearst wants a nearly 300 percent increase — a rate that would very likely be felt in your cable bill.


File photo (Associated Press)

**Related Links**

- New twist in dispute between Time Warner and WXII (Jul. 12)

Hearst says it's being paid similar fees from other cable companies.

Couch potatoes are caught in the middle.

"At some point, an agreement will be reached and things will go back to normal," said Hank Price, WXII's president and general manager. "It hasn't affected morale. They all understand it's a situation we don't have any control over."

Even without being on Time Warner, WXII still has roughly 50 percent of its audience left through satellite services and antennas, Price said.

There were enough viewers remaining Tuesday — the first day WXII was off Time Warner Cable — to allow the station to beat WFMY during all of its morning newscasts, according to Nielsen ratings.

At 6 a.m., for instance, 23,500 households were tuned into WXII versus 17,280 for WFMY.

Still, if the dispute drags on, those numbers — which help bring in ad revenue — could drop.

"It will be interesting to see what happens," Price said. "I don't have any concerns in the short term."

If an agreement is near, neither side will say. Admitted Price: "I don't have one clue." So, for now, cable viewers are stuck with WBRE, which is replacing WXII until this gets resolved. WBRE is also an NBC affiliate, so you'll

Cable spat continues, resolution uncertain :: News-Record.com : Greensbo...   http://www.news-record.com/content/2012/07/13/article/time_warner_ca...

still be able to see your favorite prime-time shows. That's the good news. The bad: It's out of Wilkes-Barre, Pa. That means WXII's local news and syndicated shows aren't available. In their places are the diverse offerings of WBRE, which include "The 700 Club" and daily talk show "PA Live!" For one viewer, it's must-flee TV. "I saw the news coming on. ... It didn't take me but one minute to figure out that these counties were nowhere around us," said Mona Wright, who lives in Greensboro. "I changed the channel."

• • •

For Time Warner Cable, that's the least of its worries at the moment. The company that owns WBRE — Nexstar Broadcasting Group, based in Irving, Texas — is claiming that its signal was stolen.

Company officials were unaware that WBRE was being seen in the Triad until somebody notified them. And they're upset it wasn't Time Warner.

"That's our point of view exactly," spokesman Joseph Jaffoni said. "They did not have the authority to do that."

Time Warner Cable disagrees. "We are acting well within our rights," local spokesman Scott Pryzwansky said. Late Friday, Nexstar filed a petition with the Federal Communication Commission to force Time Warner to stop. Things are bad for Time Warner Cable. But they may get worse.

• • •

The cable giant could have a three-way fight on its hands. When Time Warner imported WBRE's signal, it brought over its programming as well. And there's the problem. From 7 to 8 p.m., "Wheel of Fortune" and "Jeopardy" are on WBRE.

The thing is, those shows already are on local CBS affiliate WFMY — during the same hour.

Syndicated shows typically are exclusive to the station that carries them.

It's unknown what WFMY (Channel 2) plans to do, if anything.

"I really can't comment on that," said Larry Audas, the station's president and general manager. "That is being given some consideration."

• • •

There was a time when contract disputes between cable providers and broadcasting companies started — and ended — quietly.

At their worst, the disputes always seemed to coincide around big events like the Super Bowl, the Academy Awards or the Olympics, which debut July 27 and will be carried locally on — you guessed it — WXII.

But things are changing.

"Most times, you got to the brink and nothing ever happened," recalled Frank Donaldson, a faculty member in UNCG's media-studies department. "These things are starting to happen more often because the consumer really doesn't have many options."

On Wednesday, subscribers to DirecTV satellite service were told they can't see "The Daily Show" and other programs because of a contract dispute with Viacom.

On Thursday, AMC aired in-house ads that told viewers which providers currently carry the channel after Dish Network dropped it. All we can do is wait. But for how long? A good barometer might be the current Nielsen ratings period, which started June 28 and ends July 25. According to Donaldson, the dispute will hit WXII hard once "they can't sell (advertisements) based on their numbers." That's one price to pay. But there are other costs. "Both sides are going to catch hell," he said. "There's no winner. The consumer is stuck between these big companies."

• • •

Over at WXII, things are, as Price puts it, back to "normal." Advertising reps are making sales calls. News stories

are being chased.

And WXII is still in the business of producing newscasts. Even if it's not totally sure how viewers are seeing WXII, be it satellite or rabbit ears.

"We can't allow this to affect our operations," Price said. "We haven't pulled back anything. We don't chase stories differently. We are, first of all, a news organization."

Still, it's weird to be tuned to WXII at night (or do we call it WBRE now?) and after "Law and Order: SVU" ends — cue upbeat music — you hear this:

"Covering northeastern and central Pennsylvania — and everywhere you are — this is Eyewitness News at 11."

Said Price: "It's bizarre, isn't it?"

Yeah, it is.

*Contact Mike Kernels at 373-7120 or **mike.kernels@news-record.com***

## Comments

View & Submit Comments

**Confirmed *myNR* members may comment on this article.** Memberships are free, and it only takes a few minutes to create your profile. Click "Submit Comment" to sign in or register for a new account. **New members must validate their email addresses in order to comment.**

## House Rules

User comments can add a valuable and constructive dimension to community dialogue. We encourage respectful debate. But commenting is a privilege that will be revoked for violations of our Terms of Use. In addition, please follow these "House Rules" when commenting on news articles, letters or editorials.

- **Be relevant.** Discuss the story or letter opened for comments. Stay on topic.
- **Be respectful.** It's fine to disagree but not to be disagreeable. Avoid abusive or offensive language. Threats, hate speech and libelous statements will be deleted. Name-calling, threats and insults are not welcome.
- **Be substantive.** Facts add weight and credibility to your views.
- **Be honest.** Don't make up facts or pretend to be someone else.
- **Be discreet.** Don't publish telephone numbers, addresses or other personal information about yourself or others.
- **Respect copyrights.** Don't publish material that belongs to someone else.
- **Inappropriate comments will be deleted.** Users who repeatedly violate these rules will be banned from commenting on this website.
- **Commenters are solely responsible for what they post** and can be held responsible for violations of the law. Please report comments that violate these rules by clicking on the "Report Abuse" link.

☐ I understand these rules.

*Inappropriate content? Please* report abuse.

Submit Comment

---

200 E. Market Street, Greensboro, NC 27401  (336) 373-7000  (800) 553-6880
203 E. Harris Place, Eden, NC 27288  (336) 627-1781